## HAWAII *v.* MANKICHI.

### APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE TERRITORY OF HAWAII.

No. 219.   Argued March 4, 5, 1903.—Decided June 1, 1903.

In interpreting a statute the intention of the lawmaking power will prevail even against the letter of the statute; a thing may be within the letter of the statute and not within its meaning, and within its meaning, though not within its letter. *Smythe* v. *Fisk,* 23 Wallace, 374. In inserting in the Resolution of July 7, 1898, annexing Hawaii, a provision that municipal legislation not inconsistent with the Constitution of the United States should remain in force until Congress otherwise determined, Congress did not intend to impose upon the islands every clause of the Constitution, and to nullify convictions and verdicts which might, before the legislature could act, be rendered in accordance with existing legislation of the islands but not in accordance with the provisions of the Constitution, nor was such the intention of Hawaii in surrendering its autonomy.

The conviction of one who, between August 12, 1898, and June 14, 1900, was tried on information and convicted by a jury not unanimous, in ac-

cordance with legislation of the Republic of Hawaii existing at the time of the annexation, is legal notwithstanding it is not in compliance with the provisions of the Fifth and Sixth Amendments of the Constitution.

THIS was a petition by Mankichi for a writ of *habeas corpus* to obtain his release from the Oahu convict prison, where he is confined upon conviction for manslaughter, in alleged violation of the Constitution, in that he was tried upon an indictment not found by a grand jury, and convicted by the verdict of nine out of twelve jurors, the other three dissenting from the verdict.

Following the usual course of procedure in the Republic of Hawaii, prior to its incorporation as a Territory of the United States, the prisoner was tried upon an indictment much in the form of an information at common law, by the Attorney General, and endorsed "a true bill found this fourth day of May, A. D. 1899. A. Perry, first judge of the Circuit Court," etc.

From an order of the United States District Court discharging the prisoner the Attorney General of the Territory appealed to this court.

*Mr. Edmund P. Dole,* attorney general of the Territory of Hawaii, and *Mr. Solicitor General Richards* for appellant.

I. At the time of the cession, the Hawaiian Islands constituted a sovereign and independent nation, with a government of its own, republican in form, and a civilized system of law, civil and criminal, defining rights and affording remedies. The courts were open and due process of law provided. At the same time, as in some of our States, grand juries were not used nor unanimous verdicts required to convict. *Republic* v. *Edwards,* 11 Haw. Rep. 571, 579.

The statute which enacts that a verdict by nine jurors is sufficient was held to be constitutional in *The King* v. *Andreas Camacho,* 3 Haw. Rep. 385.

By the treaty of annexation which was formally consented to by the Republic of Hawaii and submitted to this country, a cession was proposed upon certain terms and conditions which were stated. By the passage of the resolution of annexation the offer of cession was accepted and the islands annexed " as

a part of the territory of the United States " upon the terms stated in the treaty and incorporated in such resolution. This resolution contains special provisions with respect to the public lands of Hawaii, the customs regulations and relations of the islands, the public debt of the Republic, the immigration of Chinese, and certain general and significant provisions securing the continuance of the government and laws of the Republic during the transition period and until Congress should provide a new and permanent government.

II. That Congress had power thus to provide a temporary government, not subject to all the restrictions of the Constitution, until it could frame a permanent government and incorporate the islands as a part of the United States, was held by this court in *Downes* v. *Bidwell*, 182 U. S. 244.

That the resolution of annexation did not incorporate the islands within the United States and render them subject to all the limitations of the Constitution applicable throughout the United States, was evidently the view of the justices who constituted the majority of the court in the *Downes* case.

The provision that " no Chinese, by reason of anything herein contained, shall be allowed to enter the United States from the Hawaiian Islands," is totally inconsistent with the theory that Congress intended by the resolution to incorporate the islands as an integral part of the United States, or extend the Constitution over them.

III. The use of the qualifying words " not contrary to the Constitution of the United States," after the words " the municipal legislation of the Hawaiian Islands," did not carry the Constitution into the islands and render void and inoperative every provision of the law of the Hawaiian Islands contrary to any of its limitations. The Hawaiian method of indicting and convicting criminals was an integral part of the criminal law of the islands. The resolution provided that the existing " municipal legislation " should remain in force until Congress should otherwise determine. There was no provision for modifying or amending it. To strike down the law of criminal procedure was to deprive the government of Hawaii of the power to preserve order and protect persons and property. It

is not to be presumed that either party to the contract of cession intended this.

The interpretation placed by President McKinley upon the resolution of annexation appears in the instructions for the transfer of sovereignty in which he directed "that the civil, judicial, and military powers in question shall be exercised by the officers of the Republic of Hawaii as it existed just prior to the transfer of sovereignty."

The status in the islands after the transfer of sovereignty under the resolution, is described by the Supreme Court of Hawaii in the *Edwards Case*, 11 Haw. Rep. 571, 578.

IV. If Congress had intended, by the resolution of annexation, to extend to the Hawaiian Islands our grand and petit jury system, it would have made some provision to that end. See the organic act "To provide a government for the Territory of Hawaii," passed April 30, 1900. 31 Stat. 141. In this measure Congress provided that the islands should be known as the Territory of Hawaii, sec. 2; established a territorial government, sec. 3; made all persons who were citizens of the Republic of Hawaii on August 12, 1898 (the date of the transfer of sovereignty), citizens of the United States, sec. 4; and provided that the Constitution and laws of the United States not locally inapplicable, with certain exceptions, should have the same force and effect within said Territory as elsewhere within the United States, sec. 5. The organization of the islands, their incorporation as a Territory of the United States, and the extension to them of the Constitution and laws of the United States, necessarily brought them, and for the first time, within the operation of the Fifth and Sixth Amendments, and therefore required the enactment of the law amending the law of civil and criminal procedure so as to extend our grand and petit jury system there.

If, by the resolution of annexation, the Constitution was extended to the islands, and our grand jury and petit jury system put in force there, why were these provisions *inaugurating* our grand jury and petit jury system inserted in the organic act? All these provisions look to the future. It is obvious that Congress, in making them, acted in the belief that the Ha-

waiian law with respect to indictments and verdicts had continued in force during the transition period and would remain operative until the organic act should take effect.

V. But what was the meaning and effect of the qualifying words "not contrary to the Constitution of the United States," used in the resolution? It is argued they must be held to extend the Constitution, with all its limitations, or be rejected altogether. No such alternative exists. The words had a meaning, and the meaning is plain. They were not employed to extend the Constitution. Before the islands could be incorporated and the Constitution with all its limitations extended, it was necessary that a new government should be framed and an organic act passed. But by the transfer of sovereignty, the bringing of the islands under the sovereign dominion of the United States, certain limitations of the Constitution became operative there. These qualifying words were inserted in recognition of the fact that there are certain fundamental rights which the Constitution protects wherever the sovereignty of the United States extends. *Downes v. Bidwell*, 182 U. S. 282.

VI. That the right to be indicted by a grand jury and be tried by a petit jury is not fundamental, that the Fifth and Sixth Amendments enforcing this right apply only to the Federal courts, and that a citizen of the United States in a criminal prosecution in a state court may be deprived of his life, liberty, or property, by due process of law, without indictment by a grand jury and without unanimity in the verdict of a petit jury, is the established doctrine of this court. *Brown v. New Jersey*, 175 U. S. 172; *Ex parte Reggel*, 114 U. S. 642; *Iowa Central Railway v. Iowa*, 160 U. S. 389; *Chicago, Burlington and Quincy Railroad v. Chicago*, 166 U. S. 226; *Missouri v. Lewis*, 101 U. S. 22; *Hurtado v. California*, 110 U. S. 516; *Bolln v. Nebraska*, 176 U. S. 83; *Maxwell v. Dow*, 176 U. S. 581; *Caldwell v. Texas*, 137 U. S. 692; *Leeper v. Texas*, 139 U. S. 462.

VII. It thus appears that the Hawaiian Islands, in providing for indictment without a grand jury and for conviction without the unanimous verdict of a petit jury, was only doing what a State of the Union may do under the Constitution. The pro-

posed treaty of 1854 provided for the incorporation of the Hawaiian Islands into the American Union as a State. By the resolution of annexation the islands were brought under the dominion of the United States, but it was not determined in what way they should be incorporated. Had Congress admitted the Hawaiian Islands into the Union as a State it could have been done without changing in any respect the law of the islands regulating criminal procedure, and as a State the government of the islands could have continued, under the Constitution, to indict criminals without a grand jury and convict them without the unanimous verdict of a petit jury. It cannot be reasonably contended that Congress could not permit the government of Hawaii to continue to administer its own law of criminal procedure, until it should be determined in what way the islands should be incorporated into the United States.

VIII. The Fifth and Sixth Amendments apply only to the courts of the United States. The courts of Hawaii during the transition period were not such courts but were the courts of the Republic of Hawaii, continued of necessity until Congress could organize the islands and establish Federal courts. The judicial powers which were to be exercised during the transition period were the existing judicial powers of the Hawaiian courts, which did not include the power to impanel grand juries or to *subpœna* witnesses before grand juries, or to try criminals by a petit jury after the manner required in Federal courts. There was no Hawaiian law for this, and therefore no judicial power. The judicial power which was continued was to accuse and try and convict in the manner provided by the Hawaiian law; and there was no authority to change or modify it, for the resolution expressly provided that the municipal legislation of the islands should remain in force until Congress should otherwise determine.

Among the judicial powers exercised under the Republic of Hawaii and to be exercised during the transition period, was that of the Supreme Court of the islands to pass finally upon all disputed questions of criminal procedure, and this court alone could do so. The question raised in is this case was unanimously

determined by it in favor of the government. While this decision may not be binding upon this court, under the peculiar circumstances, weight ought to be given to the views of the Supreme Court of Hawaii upon the matter.

*Mr. Frederic R. Coudert, Jr.,* and *Mr. Paul Fuller,* with whom *Mr. Charles Fred Adams, Mr. George A. Davis* and *Mr. F. M. Brooks* were on the brief, for appellee.

The proposition upon which appellee relies, and the soundness of which is determinative of this case, is that from the moment the annexation of the Hawaiian Islands became complete and they passed under the sovereignty and jurisdiction of the United States by virtue of the act of Congress of July 7, 1898, no citizen or inhabitant thereof could " be held for a capital or otherwise infamous crime unless on presentment of a grand jury," nor be convicted for such crime without a unanimous verdict of a petit jury.

*a.* As Hawaii was annexed by act of Congress and not by treaty, the judicial discussions contained in the opinions in the *Insular Cases* have little or no relevancy to Hawaii. It is not disputed that Congress has full power to acquire and annex foreign territories, and to provide for the government thereof, or that it is competent for Congress to extend to the inhabitants of the territories annexed the privileges and protection of the Constitution of the United States. *Shively* v. *Bowlby,* 152 U. S. 1, 48; *Morman Church Case,* 136 U. S. 44; Butler's Treaty Making Power; *Downes* v. *Bidwell,* 182 U. S. 287, *et seq.* ; Rev. Stat. sec. 1851. This intention is manifest both from the language of the act of Congress (Newlands resolution) extending the Constitution to Hawaii, and also from the history of the islands which shows them to have been American in institutions, law and government, since 1847, at which time the government of the United States was prevented by mere accident from admitting Hawaii into the Union as a State. *Downes* v. *Bidwell, supra,* p. 395; Hawaiian Civil Laws, § 1109.

*b.* Congress having full power to annex did so, and the conditions of the annexation must be sought in the law annexing the islands. The question is thus one involving the construc-

tion of a municipal statute, and has no relation to questions arising between two sovereign States under a treaty; nor is it affected by any rules of the "law of nations." The Newlands resolution, not only annexed the islands, but provided a code of municipal legislation by which the islands should be governed "until the Congress of the United States should otherwise determine." It also abrogated at once all treaties of the Hawaiian Islands with foreign nations, and all municipal legislation enacted for the fulfillment of such treaties, and all legislation which was "contrary to the Constitution of the United States," or to any existing treaty of the United States; but with these exceptions all other municipal legislation of the Hawaiian Islands, the act declared, "shall remain in force until Congress shall otherwise determine." Thus this act extended the full operation of the Constitution to Hawaii.

c. The opinions of the majority of the court in the *Insular Cases* fully support the proposition that the action of Congress in extending the full operation of the Constitution to that territory made it unlawful to conduct criminal trials save as prescribed by Article III and by the Fifth and Sixth Amendments to the Constitution of the United States. Conformity to these constitutional requirements was readily attainable under then existing Hawaiian law. *Downes* v. *Bidwell*, 182 U. S. 271; 276, 277, 286; *Springville* v. *Thomas*, 166 U. S. 177; *American Pub. Co.* v. *Fisher*, 166 U. S. 464; *Thompson* v. *Utah*, 170 U. S. 343; *Hess* v. *White*, 9 Utah, 61.

This proposition cannot be reconciled with the view of the Solicitor General that the words "nor contrary to the Constitution" contained in the act annexing the islands are merely declaratory of rights which would exist in any event without any extension by Congress. Cases holding that the States may dispense with trial by jury or indictment can have no relevancy to this case. The first eight amendments are admittedly applicable to the Federal government, and its agencies alone. The state governments are the ultimate protectors of the liberties of the citizen, and with the exception of a few instances, mainly provided for in the last three amendments, the United States courts cannot interfere. Burgess Political Science and

Constitutional Law, vol. 1, p. 516; *Hurtado* v. *California,* 110 U. S. 516; *Maxwell* v. *Dow,* 176 U. S. 584; *Thompson* v. *Utah,* 170 U. S. 343.

Upon the theory set forth in the concurring opinion in *Downes* v. *Bidwell,* the Fifth and Sixth Amendments would equally apply, because the extension of the Constitution to Hawaii by the language of the Newlands resolution is evidence of an intention on the part of Congress to incorporate those islands. If the proposed treaty upon which counsel for Hawaii lay such stress is to be examined with a view to throwing any light upon the interpretation to be given to the language of the Newlands resolution in this respect, the intention of Congress becomes even clearer. The preamble of the treaty states that " the United States and the Republic of Hawaii, in view . . . of the expressed desire of the government of the Republic of Hawaii that those islands should be incorporated into the United States as an integral part thereof, and under its sovereignty, have determined to accomplish by treaty an object so important to their mutual and permanent welfare."

See also to the same effect: Butler's Treaty Making Power, vol. 1, p. 72; Treaty with the Republic of Hawaii, June, 1897; Sen. Rep. No. 681, 55th Cong. 2d Sess. 16 March, 1898; Secretary Sherman's Report to President McKinley, accompanying the proposed treaty of Annexation, 1898, pp. 96–97; Message of President McKinley, June 16, 1897, accompanying proposed treaty (Sen. Doc. last cited); Treaty of 1893 with Hawaii, Secretary Foster's report thereon, Sen. Doc. No. 76, 52d Cong. 2d Sess. 1893; Report of Hawaiian Commission, 1898; *Ex parte Bain,* 121 U. S. 1; *Thompson* v. *Utah*; *Springville* v. *Thomas, supra*; joint resolution, July 7, 1898, 30 Stat. 750; Secretary Day's instructions, July 8, 1898; Minister Sewell's report to Secretary Day, August 12, 1898; Report of Commission on Territories, H. R. February 12, 1900; Instructions of the Secretary of State, July 8, 1898.

*d.* The proposition (relied upon by the Solicitor General) that the language of the act does not change or affect the legal situation, but leaves it just where it would have been had Congress been silent on the subject, is fallacious both in its prem-

ises and conclusion. The plain language of the Newlands act was to put in operation in the Hawaiian Islands all the provi- sions of the Constitution enforceable anywhere in the United States.

*e.* The argument *ab inconvenienti* can have no application here. The criminal courts in Hawaii have had criminal law jurisdiction for more than half a century ; they had power to empanel a grand jury and to instruct the petit jury of twelve men before whom this case was tried that conviction could only be had by unanimous verdict. Constitution, art. I, sec. 3 ; *Ex parte Edwards*, 13 Hawaii, 47 ; Broome Legal Maxims, 7th Am. ed. p. 625 ; Comyn's Digest, Grant, E. 14, S. 5 ; *Palmer* v. *Moxon*, 2 M. & S. 50 ; Civil Laws of Hawaii, sec. 1109 ; *United States* v. *Hill*, 1 Brock. 156, 159 ; *United States* v. *Clawson*, 114 U. S. 486. Congress knew this and must have intended to make trials there conform to those conducted elsewhere under Federal authority.

The argument for Hawaii is that the Newlands act conferred no constitutional rights which the islands would not have possessed in any event as a result of simple annexation by treaty or otherwise. We contend that this argument is untenable for the following reasons : The plain intention of the Newlands act was to give to Hawaii every benefit which could be enjoyed by any territory under the sovereignty of the United States save that already enjoying actual Statehood. Assuming, however, that the words " nor contrary to the Constitution " are to be construed by this court as a mere rhetorical flourish—*vox et præterea nihil*—a mere *bonne bouche* for use in debate, nevertheless there is no such distinction between natural and artificial or remedial rights in the Constitution as contended for. The positive prohibitions against certain actions on the part of the government of the United States are equally imperative whatever view the court may take of the relative importance of the various provisions in question.

The prohibitions against the establishment of a religion, the infliction of cruel or unusual punishment, the taking of property without due process of law, and trials without a jury are equally plain and imperative. They must be given equally positive

force.   To justify an overriding of the plain language of the amendments by an appeal to the philosophy of natural rights is altogether inadmissible.   *Callan v. Wilson,* 127 U. S. 549; President McKinley's instructions to Philippine Commission, April 7, 1900; *Downes* v. *Bidwell,* 182 U. S. 282; Solicitor General's Argument in *De Lima* v. *Bidwell,* 182 U. S. at pp. 155, 156; Northwest Ordinance, 1787, Arts. I and II; *Minor* v. *Happersett,* 21 Wall. 162; Ritchie on Natural Rights.

The position of the Solictor General when analyzed must be based upon one of two alternative theories : (1) Either the natural rights referred to exist of themselves and wholly apart from the Constitution, deriving their sanction from a supposed law of nature and not from that instrument; (2) or, the language of the Constitution itself protecting those rights is so broad and imperative as to be of universal application to governmental action everywhere, Hawaii included.

If the former be the proper interpretation of this interesting theory of the counsel for Hawaii, the question which would arise would not present problems of constitutional law at all, but questions of abstract philosophy.   If there are certain rights, which are protected because they are assumed to belong to the category of " natural rights," the question in each case would be as to whether such rights were " natural " or not.   If they were they would be protected because of their inherent character, and if they were not, they would either have to rely upon positive man-made law for their sanction, or else in its absence be unprotected by any law.   *Downes* v. *Bidwell,* 182 U. S. 276, 277, 282, 294.

If the court should believe that there exists a distinction in the Constitution between the prohibitions in favor of natural rights and those in favor of artificial rights, consistency necessarily dictates that all the artificial rights may equally be denied by Congress to the inhabitants of new territory to which the Constitution has not been either expressly extended or which has not been incorporated into the United States.   Taking, therefore, these rights *seriatim,* our opponent must admit that if the language, " No persons shall be held to answer for a capital or otherwise infamous crime unless on a presentment or

indictment of the grand jury," is compatible with a trial on in-
formation in Hawaii, then it must also be admitted that "any.
person (in such territory may) be subject for the same offence,
to be twice put in jeopardy of life or limb" or may be "com-
pelled in any criminal case to be a witness against himself;"
or may "be deprived of life, liberty or property without due
process of law;" and that private property may be "taken for
public use without just compensation."

The Sixth Amendment like the Fifth is devoted to conse-
crating the peculiar forms and procedure long deemed neces-
sary to the maintenance of English liberty, and if jury trial
belongs to the category of the artificial or remedial rights these
rights likewise belong to the same category; and if the court
adopt the view of our learned opponents, it must hold that the
laws of Hawaii, without violation of the Constitution, might
have deprived persons in criminal prosecution of the right "to
a speedy and public trial;" "to be informed of the nature and
cause of the accusation;" "to be confronted with the witnesses
against him;" to have compulsory process for obtaining
witnesses in his favor; and "to have assistance of counsel for
his defence"— rights which were not protected against the ac-
tion of the government in the Roman Law countries at the time
of the adoption of the Constitution, and are clearly common
law rights in their genesis and development.

It is impossible to hold that the appellee might lawfully have
been convicted without the intervention of a grand jury and the
unanimous verdict of a petit jury without at the same time
holding that he might have been deprived of these other con-
stitutional immunities.

Can such a doctrine obtain the sanction of this court? There
can be no reversal of this decision unless the court be prepared
to go to that length.

In conclusion, the appellee submits that

(1) By the act of Congress annexing the Hawaiian Islands,
its legislation was intended to be made to conform to the re-
quirements of the Fifth and Sixth Amendments, as is the case
in other Territories of the United States. This is the plain
meaning of the language employed.

(2) The situation of Hawaii was such that Congress evidently considered its institutions assimilable to those of the United States, and that to give any other interpretation to the language of Congress would be a plain violation of the spirit as well as of the letter of the joint resolution.

(3) To argue that the words " nor contrary to the Constitution " mean nothing, but were employed to show that Congress understood the Constitution to carry some vague kind of humanitarianism based upon a supposed "law of nature" into Hawaii is unsound and fanciful.

Mr. Justice Brown, after making the foregoing statement, delivered the opinion of the court.

The question involved in this case is an extremely simple one. The difficulty is in fixing upon the principles applicable to its solution. By a joint resolution adopted by Congress, July 7, 1898, 30 Stat. 750, known as the Newlands resolution, and with the consent of the Republic of Hawaii, signified in the manner provided in its constitution, the Hawaiian Islands, and their dependencies, were annexed " as a part of the territory of the United States, and subject to the sovereign dominion thereof," with the following condition : " The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this joint resolution *nor contrary to the Constitution of the United States* nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine." The material parts of this resolution are printed in the margin.[1] Though the resolution was passed July 7, the

---

[1] Joint resolution to provide for annexing the Hawaiian Islands to the United States. 30 Stat. 750.

Whereas the government of the Republic of Hawaii having, in due form, signified its consent, in the manner provided by its constitution, to cede absolutely and without reserve to the United States of America all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies, and also to cede and transfer to the United States the absolute fee and ownership of all public, government or crown lands, public buildings or edifices, ports, harbors, military equipment, and all

formal transfer was not made until August 12, when, at noon of that day, the American flag was raised over the government house, and the islands ceded with appropriate ceremonies to a representative of the United States. Under the conditions named in this resolution the Hawaiian Islands remained under

other public property of every kind and description belonging to the government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining: Therefore,

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That said cession is accepted, ratified, and confirmed, and that the said Hawaiian Islands and their dependencies be, and they are hereby, annexed as a part of the territory of the United States and are subject to the sovereign dominion thereof, and that all and singular the property and rights hereinbefore mentioned are vested in the United States of America.

\* \* \* \* \* \* \* \*

Until Congress shall provide for the government of such islands all the civil, judicial, and military powers exercised by the officers of the existing government in said islands shall be vested in such person or persons and shall be exercised in such manner as the President of the United States shall direct; and the President shall have power to remove said officers and fill the vacancies so occasioned.

The existing treaties of the Hawaiian Islands with foreign nations shall forthwith cease and determine, being replaced by such treaties as may exist, or as may be hereafter concluded, between the United States and such foreign nations. The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this joint resolution nor contrary to the Constitution of the United States nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine.

Until legislation shall be enacted extending the United States customs laws and regulations to the Hawaiian Islands the existing customs relations of the Hawaiian Islands with the United States and other countries shall remain unchanged.

\* \* \* \* \* \* \* \*

There shall be no further immigration of Chinese into the Hawaiian Islands, except upon such conditions as are now or may hereafter be allowed by the laws of the United States; and no Chinese, by reason of anything herein contained, shall be allowed to enter the United States from the Hawaiian Islands.

The President shall appoint five commissioners, at least two of whom shall be residents of the Hawaiian Islands, who shall, as soon as reasonably practicable, recommend to Congress such legislation concerning the Hawaiian Islands as they shall deem necessary or proper.

the name of the "Republic of Hawaii" until June 14, 1900, when they were formally incorporated by act of Congress under the name of the "Territory of Hawaii." 31 Stat. 141. By this act the Constitution was formally extended to these islands, sec. 5, and special provisions made for empanelling grand juries and for unanimous verdicts of petty juries. Sec. 83.

The question is whether, in continuing the municipal legislation of the islands not contrary to the Constitution of the United States, it was intended to abolish at once the criminal procedure theretofore in force upon the islands, and to substitute immediately and without new legislation the common law proceedings by grand and petit jury, which had been held applicable to other organized Territories, *Webster* v. *Reid*, 11 How. 437; *American Publishing Co.* v. *Fisher*, 166 U. S. 464; *Thompson* v. *Utah*, 170 U. S. 343, though we have also held that the States, when once admitted as such, may dispense with grand juries, *Hurtado* v. *California*, 110 U. S. 516; and perhaps allow verdicts to be rendered by less than a unanimous vote. *American Publishing Co.* v. *Fisher*, 166 U. S. 464; *Thompson* v. *Utah*, 170 U. S. 343.

In fixing upon the proper construction to be given to this resolution, it is important to bear in mind the history and condition of the islands prior to their annexation by Congress. Since 1847 they had enjoyed the blessings of a civilized government, and a system of jurisprudence modelled largely upon the common law of England and the United States. Though lying in the tropical zone, the salubrity of their climate and the fertility of their soil had attracted thither large numbers of people from Europe and America, who brought with them political ideas and traditions which, about sixty years ago, found expression in the adoption of a code of laws appropriate to their new conditions. Churches were founded, schools opened, courts of justice established, and civil and criminal laws administered upon substantially the same principles which prevailed in the two countries from which most of the immigrants had come. Taking the lead, however, in a change which has since been adopted by several of the United States, no provision was made for grand juries, and criminals were prosecuted

upon indictments found by judges.   By a law passed in 1847, the number of a jury was fixed at twelve, but a verdict might be rendered upon the agreement of nine jurors.   The question involved in this case is whether it was intended that this practice should be instantly changed, and the criminal procedure embodied in the Fifth and Sixth Amendments to the Constitution be adopted as of August 12, 1898, when the Hawaiian flag was hauled down and the American flag hoisted in its place.

If the words of the Newlands resolution, adopting the municipal legislation of Hawaii *not contrary to the Constitution of the United States*, be literally applied, the petitioner is entitled to his discharge, since that instrument expressly requires, Amendment 5, that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury;" and, Amendment 6, that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." But there is another question underlying this and all other rules for the interpretation of statutes, and that is, what was the intention of the legislative body ?   Without going back to the famous case of the drawing of blood in the streets of Bologna, the books are full of authorities to the effect that the intention of the lawmaking power will prevail, even against the letter of the statute, or, as tersely expressed by Mr. Justice Swayne in *Smythe* v. *Fiske*, 23 Wall. 374, 380 : "A thing may be within the letter of a statute and not within its meaning, and within its meaning, though not within its letter.   The intention of the lawmaker is the law."   A parallel expression is found in the opinion of Mr. Chief Justice Thompson of the Supreme Court of the State of New York, (subsequently Mr. Justice Thompson of this court,) in *People* v. *Utica Ins. Co.*, 15 Johns. 358, 381 : "A thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute, is not within the statute, unless it be within the intention of the makers."

Without going farther, numerous illustrations of this maxim are found in the reports of our own court.   Nowhere is the

doctrine more broadly stated than in *United States* v. *Kirby,* 7 Wall. 482, in which an act of Congress, providing for the punishment of any person who "shall knowingly and wilfully obstruct or retard the passage of the mail, or any driver or carrier," was held not to apply to a state officer who had a warrant of arrest against a carrier for murder, the court observing that no officer of the United States was placed by his position above responsibility to the legal tribunals of the country, and to the ordinary processes for his arrest and detention when accused of felony. "All laws," said the court, "should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter." A case was cited from Plowden, holding that a statute, which punished a prisoner as a felon who broke prison, did not extend to a prisoner who broke out when the prison was on fire, "for he is not to be hanged because he would not stay to be burned." Similar language to that in *Kirby's* case was used in *Carlisle* v. *United States,* 16 Wall. 147, 153.

In *Atkins* v. *Disintegrating Co.,* 18 Wall. 272, it was held that a suit *in personam* in admiralty was not a "civil suit" within the eleventh section of the judiciary act, though clearly a civil suit in the general sense of that phrase, and as used in other sections of the same act. See also *In re Louisville Underwriters,* 134 U. S. 488. So in *Heydenfeldt* v. *Daney Gold &c. Co.,* 93 U. S. 634, 638, it was said by Mr. Justice Davis: "If a literal interpretation of any part of it (a statute) would operate unjustly, or lead to absurd results, or be contrary to the evident meaning of the act taken as a whole, it should be rejected. There is no better way of discovering its true meaning, when expressions in it are rendered ambiguous by their connection with other clauses, than by considering the necessity for it, and the causes which induced its enactment." To the same effect are the *Church of the Holy Trinity* v. *United States,* 143 U. S. 457, in which many cases are cited and reviewed, and

*Lau Ow Bew* v. *United States,* 144 U. S. 47, 59. In this latter case it was held that a statute requiring the permission of the Chinese government, and the identification of " every Chinese person other than a laborer, who may be entitled by treaty or act of Congress to come within the United States," did not apply to " Chinese merchants already domiciled in the United States, who, having left the country for temporary purposes, *animo revertendi,* seek to reënter it on their return to their business and their homes." Said the Chief Justice : " Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion."

Two recent English cases are instructive in this connection : In *Plumstead Board of Works* v. *Spackman,* L. R. 13 Q. B. D. 878, 887, it was said by the Master of Rolls, afterwards Lord Esher : " If there are no means of avoiding such an interpretation of the statute," (as will amount to a great hardship,) " a judge must come to the conclusion that the legislature by inadvertence has committed an act of legislative injustice ; but to my mind a judge ought to struggle with all the intellect that he has, and with all the vigor of mind that he has, against such an interpretation of an act of Parliament ; and, unless he is forced to come to a contrary conclusion, he ought to assume that it is impossible that the legislature could have so intended." See also *Ex parte Walton,* L. R. 17 Ch. D. 746.

Is there any room for construction in this case, or, are the words of the resolution so plain that construction is impossible ? There are many reasons which induce us to hold that the act was not intended to interfere with the existing practice when such interference would result in imperiling the peace and good order of the islands. The main objects of the resolution were, 1st, to accept the cession of the islands theretofore made by the Republic of Hawaii, and to annex the same " as a part of the territory of the United States and subject to the sovereign dominion thereof ; " 2d, to abolish all existing treaties with various nations, and to recognize only treaties between the United States and such foreign nations ; 3d, to continue the existing laws and customs regulations, so far as they were not

inconsistent with the resolution, or contrary to the Constitution, until Congress should otherwise determine. From the terms of this resolution it is evident that it was intended to be merely temporary and provisional; that no change in the government was contemplated, and that until further legislation the Republic of Hawaii continued in existence. Even its name was not changed until 1900, when the "Territory of Hawaii" was organized. The laws of the United States were not extended over the islands until the organic act was passed on April 30, 1900, when, so careful was Congress not to disturb the existing condition of things any further than was necessary, it was provided, sec. 5, that only "the laws of the United States, which are not locally inapplicable, shall have the same force and effect within the said Territory as elsewhere in the United States." There was apparently some discretion left to the courts in this connection. *Indianapolis &c. R. R. Co.* v. *Horst,* 93 U. S. 291, 299. The fact already mentioned that Congress in this organic act inserted a provision for the empanelling of grand juries and for the unanimity of verdicts indicates an understanding that the previous practice had been pursued up to that time, and that a change in the existing law was contemplated.

Of course, under the Newlands resolution, any new legislation must conform to the Constitution of the United States, but how far the exceptions to the existing municipal legislation were intended to abolish existing laws, must depend somewhat upon circumstances. Where the immediate application of the Constitution required no new legislation to take the place of that which the Constitution abolished, it may be well held to have taken immediate effect; but where the application of a procedure hitherto well known and acquiesced in, left nothing to take its place, without new legislation, the result might be so disastrous that we might well say that it could not have been within the contemplation of Congress. In all probability the contingency which has actually arisen occurred to no one at the time. If it had, and its consequences were foreseen, it is incredible that Congress should not have provided against it.

If the negative words of the resolution, "nor contrary to the Constitution of the United States," be construed as impos-

ing upon the islands every provision of a Constitution, which must have been unfamiliar to a large number of their inhabitants, and for which no previous preparation had been made, the consequences in this particular connection would be that every criminal in the Hawaiian Islands convicted of an infamous offence between August 12, 1898, and June 14, 1900, when the act organizing the territorial government took effect, must be set at large ; and every verdict in a civil case rendered by less than a unanimous jury held for naught. Surely such a result could not have been within the contemplation of Congress. It is equally manifest that such could not have been the intention of the Republic of Hawaii in surrendering its autonomy. Until then it was an independent nation, exercising all the powers and prerogatives of complete sovereignty. It certainly could not have anticipated that, in dealing with another independent nation, and yielding up its sovereignty, it had denuded itself, by a negative pregnant, of all power of enforcing its criminal laws according to the methods which had been in vogue for sixty years, and was adopting a new procedure for which it had had no opportunity of making preparation. The legislature of the Republic had just adjourned, not to convene again until some time in 1900, and not actually convening until 1901. The resolution on its face bears evidence of having been intended merely for a temporary purpose, and to give time to the Republic to adapt itself to such form of territorial government as should afterwards be adopted in its organic act.

The language of Mr. Buchanan, then Secretary of State, in holding that the military government established in California did not cease to exist with the treaty of peace, but continued as a government *de facto* until Congress should provide a territorial government, is peculiarly applicable to this case. " The great law of necessity justifies this conclusion. The consent of the people is irresistibly inferred from the fact that no civilized community could possibly desire to abrogate an existing government, when the alternative presented would be to place themselves in a state of anarchy, beyond the protection of all laws, and reduce them to the unhappy necessity of submitting to the dominion of the strongest." 16 How. 184.

It is insisted, however, that as the common law of England had been adopted in Hawaii by the Code of 1897, it was within the power of the courts to summon a grand jury, and that such action might have been taken and criminals tried upon indictments properly found, and convicted by unanimous verdict. The suggestion is rather fanciful than real, since section 1109 of the Code of 1897, adopting the common law of England, contained a proviso that "no person shall be subject to criminal proceedings except as provided by the Hawaiian laws." These laws provided expressly, sec. 616, Penal Laws of 1897, as follows: " The necessary bills of indictment shall be duly prepared by a legal prosecuting officer, and be duly presented to the presiding judge of the court before the arraignment of the accused, and such judge shall, after examination, certify upon each bill of indictment whether he finds the same a true bill or not." The question thus squarely presented to every judge in the Republic was, whether he was bound to summon a grand jury under the Newlands resolution, when no provision existed by law for empanelling the same or their payment, and when in so doing he was obliged to ignore the plain statute of his own country.

It is not intended here to decide that the words " nor contrary to the Constitution-of the United States " are meaningless. Clearly they would be operative upon any municipal legislation thereafter adopted, and upon any proceedings thereafter had, when the application of the Constitution would not result in the destruction of existing provisions conducive to the peace and good order of the community. Therefore we should answer without hesitation in the negative the question put by counsel for the petitioner in their brief: " Would municipal statutes of Hawaii, allowing a conviction of treason on circumstantial evidence, or on the testimony of one witness, depriving a person of liberty by the will of the legislature and without process, or confiscating private property for public use without compensation, remain in force after an annexation of the Territory to the United States, which was conditioned upon the extinction of all legislation contrary to the Constitution ?" We would even go farther, and say that most, if not all, the privileges and immunities contained in the bill of rights of the Con-

stitution were intended to apply from the moment of annexation; but we place our decision of this case upon the ground that the two rights alleged to be violated in this case are not fundamental in their nature, but concern merely a method of procedure which sixty years of practice had shown to be suited to the conditions of the islands, and well calculated to conserve the rights of their citizens to their lives, their property and their well-being.

Inasmuch as we are of opinion that the *status* of the islands and the powers of their provisional government were measured by the Newlands resolution, and the case has been argued upon that theory, we have not deemed it necessary to consider what would have been its position had the important words " nor contrary to the Constitution of the United States " been omitted, or to reconsider the questions which arose in the *Insular Tariff* cases regarding the power of Congress to annex territory without at the same time extending the Constitution over it. Of course, for the reasons already stated, the questions involved in this case could arise only from such as occurred between the taking effect of the joint resolution of July 7, 1898, and the act of April 30, 1900, establishing the territorial government.

*The decree of the District Court for the Territory of Hawaii must be reversed, and the case remanded to that court with instructions to dismiss the petition.*

MR. JUSTICE WHITE and MR. JUSTICE McKENNA, concurring.

The court in its opinion disposes of the case solely by a construction of the act of Congress. Conceding, *arguendo*, that such view is wholly adequate to decide the cause, I concur in the meaning of the act as expounded in the opinion of the court, and in the main with the reasoning by which that interpretation is elucidated. I prefer, however, to place my concurrence in the judgment upon an additional ground which seems to be more fundamental. That ground is this: That as a consequence of the relation which the Hawaiian Islands occupied towards the United States, growing out of the resolution of annexation, the provisions of the Fifth and Sixth Amend-

ments of the Constitution concerning grand and petit juries were not applicable to that territory, because, whilst the effect of the resolution of annexation was to acquire the islands and subject them to the sovereignty of the United States, neither the terms of the resolution nor the situation which arose from it served to incorporate the Hawaiian Islands into the United States and make them an integral part thereof. In other words, in my opinion, the case is controlled by the decision in *Downes* v. *Bidwell*, 182 U. S. 244.

The resolution of Congress annexing the islands, it seems to me, makes the conclusion just stated quite clear, and manifests that it was not intended to incorporate the islands *eo instanti*, but on the contrary, that the purpose was, whilst acquiring them, to leave the permanent relation which they were to bear to the Government of the United States to await the subsequent determination of Congress. By the resolution the islands were annexed, not absolutely, but merely "as a part of the territory of the United States," and were simply declared to be subject to its sovereignty. The minutest examination of the resolution fails to disclose any provision declaring that the islands are incorporated and made a part of the United States or endowing them with the rights which would arise from such relation. On the contrary, the resolution repels the conclusion of incorporation. Thus it provided for the government of the islands by a commission, to be appointed by the President until Congress should have opportunity to create the government which would be deemed best. Further, it stipulated "until legislation shall be enacted extending the United States customs laws and regulations to the Hawaiian Islands the existing customs relations of the Hawaiian Islands with the United States and other countries shall remain unchanged." And, if possible, to make the purpose of Congress yet clearer, the act provided that "the President shall appoint five commissioners, at least two of whom shall be residents of the Hawaiian Islands, who shall, as soon as reasonably practicable, recommend to Congress such legislation concerning the Hawaiian Islands as they shall deem necessary or proper." All these provisions, in my opinion, clearly point out that, whilst the purpose was to acquire

and extend the sovereignty of the United States over the islands, it was proposed only to provide by the resolution of annexation a provisional government until Congress should become possessed of the information necessary to enable it to determine what should be the permanent status of the annexed territory. And the meaning of the resolution of annexation thus indicated by its terms is reflexly demonstrated by the act " to provide a government for the Territory of Hawaii," approved April 30, 1900, by which the islands were undoubtedly made a part of the United States in the fullest sense and given a territorial form of government. When the two acts are put in contrast and the declarations in the later act are considered, which were not found in the earlier act, and which it is to be presumed were intentionally omitted from the resolution providing for annexation, I can see no reason for holding that the mere act of annexation accomplished the result which was brought about by the subsequent law containing the more comprehensive provisions.

The mere annexation not having effected the incorporation of the islands into the United States, it is not an open question that the provisions of the Constitution as to grand and petit juries were not applicable to them. *Hurtado* v. *California,* 110 U. S. 516; *Ross's case,* 140 U. S. 453, 473; *Bolln* v. *Nebraska,* 176 U. S. 83, and cases cited on page 86; *Maxwell* v. *Dow,* 176 U. S. 581, 584; and *Downes* v. *Bidwell, supra.*

Nor is there anything in the provision in the act of annexation relating to the operation of the Constitution in the annexed territory which militates against the conclusions previously expressed. The text of the resolution on this subject is as follows:

" The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this joint resolution nor contrary to the Constitution of the United States nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine."

Now, in so far as the Constitution is concerned, the clause subjecting the existing legislation which was provisionally con-

tinued to the control of the Constitution, clearly referred only
to the provisions of the Constitution which were applicable and
not to those which were inapplicable.   In other words, having
by the resolution itself created a condition of things absolutely
incompatible with immediate incorporation, Congress, mindful
that the Constitution was the supreme law, and that its appli-
cable provisions were operative at all times everywhere and
upon every condition and persons, declared that nothing in
the joint resolution continuing the customs legislation and local
law should be considered as perpetuating such laws, where
they were inconsistent with those fundamental provisions of
the Constitution, which were by their own force applicable to
the territory with which Congress was dealing.

   To say the contrary would be but to declare that Congress
had provided for the continuance of the tariff and other legis-
lation, whilst at the same time it had enacted that that result
should not be brought about.   It would, moreover, lead to the
assumption that provisions of the Constitution which were in-
applicable to the particular situation should yet govern and
control that condition.

   Mr. Justice McKenna authorizes me to say that he also
concurs in the result for the foregoing reasons.

   Mr. Chief Justice Fuller, with whom concurred Mr. Jus-
tice Harlan, Mr. Justice Brewer and Mr. Justice Peckham,
dissenting.

   In my opinion the final order of the District Court should be
affirmed.

   Mankichi was tried on an information filed May 4, 1899,
charging him with the commission of the crime of murder on
March 26 of that year, and was found guilty of manslaughter
in the first degree by the verdict of nine jurors.   The statutes
of Hawaii prior to July 7, 1898, provided for such trial and
conviction.

   July 7, 1898, the "joint resolution to provide for annexing
the Hawaiian Islands to the United States" was approved.

30 Stat. 750. Surrender of sovereignty and possession was effected August 12, 1898.

The act "To provide a government for the Territory of Hawaii" was approved April 30, 1900. 31 Stat. 141.

If Articles of Amendment V and VI were applicable to the Territory of Hawaii after August 12, 1898, the district judge was right, and Mankichi was entitled to be discharged.

The annexation resolution contained three sections, and, omitting the second and third as not material here, is given in the margin.[1]

---

[1] "Whereas the Government of the Republic of Hawaii having, in due form, signified its consent, in the manner provided by its constitution, to cede absolutely and without reserve to the United States of America all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies, and also to cede and transfer to the United States the absolute fee and ownership of all public, Government, or Crown lands, public buildings or edifices, ports, harbors, military equipment, and all other public property of every kind and description belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining: Therefore,

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That said cession is accepted, ratified, and confirmed, and that the said Hawaiian Islands and their dependencies be, and they are hereby, annexed as a part of the territory of the United States and are subject to the sovereign dominion thereof, and that all and singular the property and rights hereinbefore mentioned are vested in the United States of America.

The existing laws of the United States relative to public lands shall not apply to such lands in the Hawaiian Islands; but the Congress of the United States shall enact special laws for their management and disposition: *Provided,* That all revenue from or proceeds of the same, except as regards such part thereof as may be used or occupied for the civil, military, or naval purposes of the United States, or may be assigned for the use of the local government, shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes.

Until Congress shall provide for the government of such islands all the civil, judicial, and military powers exercised by the officers of the existing government in said islands shall be vested in such person or persons and shall be exercised in such manner as the President of the United States shall direct; and the President shall have power to remove said officers and fill the vacancies so occasioned.

The existing treaties of the Hawaiian Islands with foreign nations shall forthwith cease and determine, being replaced by such treaties as may ex-

By the specific language of this resolution no legislation which was contrary to the Constitution of the United States remained in force.

The language is plain and unambiguous, and resort to construction or interpretation is absolutely uncalled for. To tamper with the words is to eliminate them.

This is not one of those rare cases where adherence to the letter leads to manifest absurdity as in *United States* v. *Kirby,* 7 Wall. 482, and the illustrations there drawn by Mr. Justice Field from Puffendorf and Plowden.

The argument *ab inconvenienti,* without more, is an unsafe guide, and departure from the plain meaning tends to usurp legislative functions. Besides, that argument has no application here. Courts in Hawaii have had criminal law jurisdiction for more than half a century; and they had power to empanel a

---

ist, or as may be hereafter concluded, between the United States and such foreign nations. The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this joint resolution nor contrary to the Constitution of the United States nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine.

Until legislation shall be enacted extending the United States customs laws and regulations to the Hawaiian Islands the existing customs relations of the Hawaiian Islands with the United States and other countries shall remain unchanged.

The public debt of the Republic of Hawaii, lawfully existing at the date of the passage of this joint resolution, including the amounts due to depositors in the Hawaiian Postal Savings Bank, is hereby assumed by the Government of the United States; but the liability of the United States in this regard shall in no case exceed four million dollars. So long, however, as the existing Government and the present commercial relations of the Hawaiian Islands are continued as hereinbefore provided said Government shall continue to pay the interest on said debt.

There shall be no further immigration of Chinese into the Hawaiian Islands, except upon such conditions as are now or may hereafter be allowed by the laws of the United States; and no Chinese, by reason of anything herein contained, shall be allowed to enter the United States from the Hawaiian Islands.

The President shall appoint five commissioners, at least two of whom shall be residents of the Hawaiian Islands, who shall, as soon as reasonably practicable, recommend to Congress such legislation concerning the Hawaiian Islands as they shall deem necessary or proper."

grand jury, *United States* v. *Hill*, 1 Brock. 156, 159, and to direct the petit jury of twelve that conviction could only be had by a unanimous verdict.

In giving the instructions which accompanied the joint resolution, Mr. Justice Day, then Secretary of State, under date of July 8, 1898, said: "These recitals, it will be observed, are made in the language of the treaty of annexation, concluded at Washington on the 16th day of June, 1897. They, as well as the other terms of that treaty, were advisedly incorporated into the joint resolution, because they embodied the terms of cession, which have not only been agreed upon by the two Governments, but which have also been ratified by the Government of the Republic of Hawaii."

The reference is to a proposed treaty signed by Secretary Sherman on the part of the United States, and by three commissioners on the part of Hawaii, to which the advice and consent of the Senate was not given.

The preamble to this treaty expressed the "desire of the Government of the Republic of Hawaii that those islands should be incorporated into the United States as an integral part thereof and under its sovereignty," and that the two Governments "have determined to accomplish by treaty an object so important to their mutual and permanent welfare."

The language of the remainder of the treaty is reproduced in the joint resolution, including the provision that the municipal legislation of Hawaii should remain in force when not inconsistent with the resolution or any existing treaty of the United States nor contrary to the Constitution of the United States.

By the resolution Congress provided for the government of Hawaii under the authority of the United States. All the civil, judicial and military powers exercised by the officers in the islands were vested in the appointees of the President, and were to be exercised "in such manner as the President of the United States shall direct." The President prorogued the legislature; reappointed the officers "of the Republic of Hawaii as it existed just prior to the transfer of sovereignty; required such officers to take an oath of allegiance to the United

States; and required all bonded officers to renew their bonds to the Government of the United States."

All existing treaties of Hawaii were abrogated; further immigration of the Chinese was prohibited except as allowed "by the laws of the United States;" the customs laws of Hawaii, and its municipal legislation not contrary to the Constitution of the United States, were continued in force until Congress should otherwise determine.

Commissioners were to be and were appointed to recommend to Congress such legislation as they might "deem necessary and proper."

The act of April 30, 1900, was the result of their report, and provided further government, dealing with details, and permanent instead of temporary. But while temporary under the resolution, it was nevertheless a system of government, and the territory was under the sovereignty of the United States and governed by its agencies.

By the resolution the annexation of the Hawaiian Islands became complete, and the object of the proposed treaty, that "those islands should be incorporated into the United States as an integral part thereof, and under its sovereignty;" was accomplished.

The exceptions in respect of customs relations and the prohibition of the immigration of the Chinese, embodied in the treaty agreement and in the resolution, could not destroy the effect of incorporation or of the extension of the Constitution. If this were possible, the act of April 30, 1900, would be open to the same objection.

It was said at the bar that the words " contrary to the Constitution of the United States " were inserted as a declaration that certain "fundamental rights and principles, the basis of all free government, which cannot with impunity be transcended," were to be protected in Hawaii; that certain limitations of the Constitution applied " wherever the jurisdiction of the United States extends." But in that view the insertion of the phrase, was superfluous and accomplished nothing.

Nor were we informed what those fundamental rights are. This is not a question of natural rights, on the one hand, and

artificial rights on the other, but of the fundamental rights of every person living under the sovereignty of the United States in respect of that Government. And among those rights is the right to be free from prosecution for crime unless after indictment by a grand jury, and the right to be acquitted unless found guilty by the unanimous verdict of a petit jury of twelve.

In *Callan* v. *Wilson*, 127 U. S. 540, 549, it was said by Mr. Justice Harlan, speaking for the court : " And as the guarantee of a trial by jury, in the third article, implied a trial in that mode and according to the settled rules of the common law, the enumeration in the Sixth Amendment, of the rights of the accused in criminal prosecutions, is to be taken as a declaration of what those rules were, and is to be referred to the anxiety of the people of the States to have in the supreme law of the land, *and so far as the agencies of the General Government were concerned*, a full and distinct recognition of those rules, as involving the fundamental rights of life, liberty, and property."

Common law rights are described in the Ordinance of 1787 as " fundamental principles of civil and religious liberty," and the amendments embodying common law rights were demanded, as the preamble of the act of Congress proposing them declares, " in order to prevent misconstruction or abuse " of the powers of the General Government.

Assuming, solely for the sake of argument, that the mere fact of annexation might not in itself have at once extended to the inhabitants of Hawaii all the rights, privileges and immunities guaranteed by the Constitution, and that Congress had the power to impose limitations in that regard, I think not only that Congress did not do so in the particulars in question, but that in reënacting existing legislation, Congress, by the terms of the resolution, intentionally invalidated so much thereof as in these particulars was inconsistent with the Constitution. The presumptions are all opposed to any capitulation in the matter of common law institutions.

MR. JUSTICE HARLAN dissenting.

This case is of such exceptional importance in respect of the

principles announced by my brethren of the majority, that I deem it not inappropriate to state my views in a separate opinion.

I entirely concur with the Chief Justice in holding that the accused was properly discharged from custody. Whether the legality of his detention be tested by the Constitution, or alone by the Joint Resolution of Congress, approved July 7, 1898, providing "for annexing the Hawaiian Islands to the United States," his imprisonment was, in my judgment, wholly unauthorized.

What, at the time of the arrest and trial of the accused, were the relations existing between the United States and Hawaii? By what law were the personal rights of the people of Hawaii then determinable? The decision of the case depends upon the answer to these questions.

In 1897 a Treaty between the United States and the Republic of Hawaii was signed by Secretary Sherman on behalf of the United States and by three Commissioners on the part of Hawaii. Senate Report No. 681, 55th Congress, 2d Sess. March 16, 1898.

The Preamble to that Treaty expressed the "desire of the Government of the Republic of Hawaii that those Islands shall be *incorporated* into the United States *as an integral part thereof and under its sovereignty.*" It also recited the determination of the two Governments "to accomplish by treaty an object so important to their mutual and permanent welfare."

The Treaty stipulated that until Congress provided for the government of such Islands, all the civil, judicial and military powers exercised by the officers of the existing government in the Island should be vested in such person or persons, and be exercised in such manner, as the President of the United States directed, and that the President should have power to remove said officers and fill the vacancies so occasioned; also that the municipal legislation of the Hawaiian Islands "not inconsistent with this treaty *nor contrary to the Constitution of the United States* nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine."

The Treaty was not formally ratified, but its object was accomplished by the passage of the Joint Resolution of July 7, 1898. 30 Stat. 750.

In order that the full scope of that Resolution may be seen, it is here given in full:

"Whereas the Government of the Republic of Hawaii having, in due form, signified its consent, in the manner provided by its constitution, to cede absolutely and without reserve to the United States of America *all rights of sovereignty of whatsoever kind* in and over the Hawaiian Islands and their dependencies, and also to cede and transfer to the United States the absolute fee and ownership of all public, Government, or Crown lands, public buildings or edifices, ports, harbors, military equipment, and all other public property of every kind and description belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining: Therefore,

"*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That said cession is accepted, ratified, and confirmed, and that the said Hawaiian Islands and their dependencies be, and they are hereby, annexed *as a part of the territory of the United States* and are subject to the *sovereign dominion thereof,* and that all and singular the property and rights hereinbefore mentioned are vested in the United States of America.

"The existing laws of the United States relative to public lands shall not apply to such lands in the Hawaiian Islands; but the Congress of the United States shall enact special laws for their management and disposition: *Provided,* That all revenue from or proceeds of the same, except as regards such part thereof as may be used or occupied for the civil, military, or naval purposes of the United States, or may be assigned for the use of the local government, shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other puplic purposes.

"Until Congress shall provide for the government of such Islands all the civil, judicial, and military powers exercised by the officers of the existing government in said Islands shall be vested

in such person or persons and shall be exercised in such manner as the President of the United States shall direct; and the President shall have power to remove said officers and fill the vacancies so occasioned.

"The existing treaties of the Hawaiian Islands with foreign nations shall forthwith cease and determine, being replaced by such treaties as may exist, or as may be hereafter concluded, between the United States and such foreign nations. The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this Joint Resolution *nor contrary to the Constitution of the United States* nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine.

"Until legislation shall be enacted extending the United States customs laws and regulations to the Hawaiian Islands the existing customs relations of the Hawaiian Islands with the United States and other countries shall remain unchanged.

"The public debt of the Republic of Hawaii, lawfully existing at the date of the passage of this Joint Resolution, including the amounts due to depositors in the Hawaiian Postal Savings Bank, is hereby assumed by the Government of the United States; but the liability of the United States in this regard shall in no case exceed four million dollars. So long, however, as the existing Government and the present commercial relations of the Hawaiian Islands are continued as hereinbefore provided, said Government shall continue to pay the interest on said debt.

"There shall be no further immigration of Chinese into the Hawaiian Islands, except upon such conditions as are now or may hereafter be allowed by the laws of the United States; and no Chinese, by reason of anything herein contained, shall be allowed to enter the United States from the Hawaiian Islands.

"The President shall appoint five commissioners, at least two of whom shall be residents of the Hawaiian Islands, who shall, as soon as reasonably practicable, *recommend* to *Congress* such legislation concerning the Hawaiian Islands as they shall deem necessary or proper.

" § 2. That the commissioners hereinbefore provided for shall be appointed by the President, by and with the advice and consent of the Senate.

" § 3. That the sum of one hundred thousand dollars, or so much thereof as may be necessary, is hereby appropriated, out of any money in the Treasury not otherwise appropriated, and to be immediately available, to be expended at the discretion of the President of the United States of America, for the purpose of carrying this Joint Resolution into effect." 30 Stat. 750.

Under date of July 8, 1898, the Secretary of State transmitted a copy of this Joint Resolution to the United States Envoy Extraordinary and Minister Plenipotentiary accredited to Hawaii, with instructions as to his duty in the premises.

Referring to the Preamble of that Resolution, the Secretary, in his letter of instructions, said: " These recitals, it will be observed, are made in the language of the treaty of annexation concluded at Washington on the 16th day of June, 1897. They, as well as the other terms of that treaty, were advisedly incorporated in the Joint Resolution, because they embody the terms of cession which have not only been agreed upon by the two Governments, but which have also been ratified by the Government of the Republic of Hawaii. The Joint Resolution therefore accepts, ratifies and confirms on the part of the United States the cession formally agreed to and approved by the Republic of Hawaii. As by the adoption of the Joint Resolution the cession of the Hawaiian Islands and their dependencies to the United States is thus concluded, it is assumed that no further action will be necessary on the part of the Hawaiian Government beyond the formalities of transfer. Should that Government, however, desire to take any further action, formally confirmatory of what has been done, no objection will be interposed on the part of the United States. When all preliminaries shall have been settled, you are instructed to accept, in the name of the United States, the formal transfer of the sovereignty and property of the Hawaiian Government, and to raise the American flag, with such suitable ceremonies as may be agreed on for the occasion. It may be advisable

for the Hawaiian Government to deliver to you an inventory
of the public property transferred to the United States. There
are several provisions of the Joint Resolution to which it is
deemed proper specially to refer. Until Congress shall provide
for the government of Hawaii, 'all the civil, judicial and military
powers exercised by the officers of the existing Government,' are
to be vested in such person or persons, and to be exercised in such
manner, as the President of the United States shall direct. In
the exercise of the power thus conferred upon him by the Joint
Resolution, the President hereby directs that the civil, judicial
and military powers in question shall be exercised by the offi-
cers of the Republic of Hawaii as it existed just prior to the
transfer of sovereignty, subject to his power to remove such
officers and to fill the vacancies. All such officers will be re-
quired at once to take an oath of *allegiance to the United States,*
and all the military forces will be required to take a similar
oath; and all bonded officers will be required *to renew their
bonds to the Government of the United States.* The powers of
the minister of foreign affairs will, upon the transfer of the
sovereignty and property of Hawaii to the United States,
necessarily cease, so far as they relate to the conduct of diplo-
matic intercourse between Hawaii and foreign powers. The
municipal legislation of Hawaii, except such as was enacted
for the fulfillment of the treaties between that country and
foreign nations, and except such as is inconsistent with the
Joint Resolution, or *contrary to the Constitution of the United
States,* or to any existing treaty of the United States, is to re-
main in force till the Congress of the United States shall other-
wise determine. The existing customs relations of Hawaii
with the United States and with other countries are to remain
unchanged till Congress shall have extended the customs laws
and regulations of the United States to the Islands. Under
these various provisions, the Government of the Islands will
proceed without interruption. Upon the completion of the
formalities of the transfer, your functions as Envoy Extraordi-
nary and Minister Plenipotentiary to Hawaii will necessarily
cease. . . . These instructions will be borne to you by Rear
Admiral Joseph N. Miller, U. S. Navy, who will proceed to

Honolulu in the U. S. S. Philadelphia, and who, together with the commander of the United States military forces present, will act with you in the ceremonies attending the formal transfer of the Islands to the United States."

So that the Secretary of State gave the representative of the United States to understand that the Joint Resolution and the Treaty had the same object in view, namely, to incorporate Hawaii into the United States "as an integral part thereof and under its sovereignty."

Proceeding in our examination of the history of annexation, we find that under date of August 15, 1898, the United States Minister made his official report as to what was done in execution of the Joint Resolution annexing Hawaii to the United States. That report contains the details of the ceremonies attending the formal transfer of the sovereignty and property of the Hawaiian Government to the United States. From it the following extract is made:

" At a quarter before 12 [on August 12, 1898,] the ceremonies opened with prayer, at the conclusion of which I [the United States Minister] arose, and, addressing President Dole, said: ' Mr. President, I present you a certified copy of a Joint Resolution of the Congress of the United States, approved by the President on July 7, 1898, entitled " Joint Resolution to provide for annexing the Hawaiian Islands to the United States." This Joint Resolution accepts, ratifies, and confirms on the part of the United States the cession formally consented to and approved by the Republic of Hawaii.' . . . President Dole, taking the copy of the resolutions, said: ' A treaty of political union having been made, and the cession formally consented to by the Republic of Hawaii having been accepted by the United States of America, I now, in the interest of the Hawaiian body politic, and with full confidence in the honor, justice, and friendship of the American people, yield up to you, as the representative of the Government of the United States, the sovereignty and public property of the Hawaiian Islands;' and, waving his hand to his chief of staff, the Hawaiian flag was saluted by the battery of the Hawaiian National Guard, in which salute our ships in the harbor joined. Then the Hawaiian band played

Hawaii Ponoi for the last time, taps were sounded, and the Hawaiian flag came down, and was taken possession of by the Hawaiian corporal of the guard. Then, replying to President Dole, I said : 'Mr. President, in the name of the United States, I accept the transfer of the sovereignty and property of the Hawaiian Government. The admiral commanding the United States naval forces in these waters will proceed to perform the duty intrusted to him.' Thereupon the American flag was raised as the band played the Star Spangled Banner, and saluted."

The United States Minister then congratulated " his *fellow-countrymen*," on " the inevitable consummation of the national policies and the natural relations between the two countries *now formally and indissolubly united.*" He urged the Hawaiians not to rest content in the enjoyment of free institutions, but " to help maintain them in the spirit they will be extended to you, in the spirit you have sought them, in the spirit of fraternity and equality, in the spirit of the Constitution itself, *now the supreme law of the land.*" The oath of allegiance was thereupon administered by the Chief Justice of Hawaii to the officers of that country, each one swearing that he would " support and defend the Constitution of the United States of America against all enemies, foreign and domestic."

It is thus perceived that the Republic of Hawaii ceded, absolutely and without reserve, to the United States of America, all rights and sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies, as well as the absolute fee and ownership of all public, Government or Crown lands, public buildings or edifices, ports, harbors, military equipment, and all other public property of every kind and description belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining ; that the cession was accepted, ratified and confirmed by Congress, and that the Hawaiian Islands and their dependencies were " annexed as a part of the territory of the United States and are subject to the sovereign dominion thereof ; " and, what is of vital moment in this case, that such municipal legislation of the Islands as was not " *contrary to the Constitution of the*

*United States,*"—and therefore *only* such legislation as was consistent with that instrument—was to remain in force until Congress otherwise determined. Necessarily, therefore, if regard be had merely to the action of Congress, all local legislation inconsistent with the Constitution ceased to have any force in Hawaii after that country thus passed under the sovereign dominion of the United States.

After the passage of the Joint Resolution, and after the formal transfer of Hawaii to the United States, namely, in 1899, Osaki Mankichi, a subject of Japan, was tried in one of the courts of Hawaii for the alleged crime of murder. He was convicted of the crime of manslaughter in the first degree, and sentenced to imprisonment for twenty years at hard labor. Although the crime was of an infamous nature, there was no presentment or indictment of a grand jury, and the verdict was rendered by only nine of the twelve persons composing the petit jury.

Having been placed in prison pursuant to the verdict and sentence, the accused, in 1901, sued out a writ of *habeas corpus* from the District Court of the United States for the Territory of Hawaii, and was discharged upon the ground that his trial, conviction, sentence and imprisonment were in violation of the Constitution of the United States, in that he was not proceeded against upon the presentment or indictment of a grand jury, nor found guilty by the unanimous verdict of the petit jury, but only by a majority of the jurors. Hence this appeal.

It should be here stated that by the act of Congress of April 30, 1900, c. 339, a territorial government was organized over the Islands which had been acquired under the Joint Resolution of 1898, and those Islands were designated as the Territory of Hawaii. In that act provision was made for grand juries, and also for petit juries in criminal cases, to be composed, as at common law, of twelve persons. It was also declared that "no person should be convicted in any criminal case except by unanimous verdict of the jury." 31 Stat. 141, 157. It is not contended that that act can have any effect upon the decision of the present case, because the trial, conviction, sentence and imprison-

ment of the accused all occurred after the formal transfer to
the United States pursuant to the Joint Resolution of 1898, and
before the passage of the above act of 1900.  We must conse-
quently determine the legality of the proceedings against Man-
kichi by the law as it was between the date of the acquisition
of sovereignty over the Islands by the United States and the
date of the passage of the act of 1900.  To that question I now
address myself.

It must be assumed that the trial of the accused was in ac-
cordance with the municipal law of Hawaii as it existed prior
to the approval of the Joint Resolution of 1898.  The contrary
is not asserted by the accused.  But it is conceded by the court
that if the words " contrary to the Constitution of the United
States " in that Resolution are interpreted according to their
usual, ordinary meaning, and if the validity of the trial be
tested by the provisions of that instrument, then the prisoner
is entitled to his discharge.  Nevertheless, it is now held that
although the United States acquired, on the passage of that
Resolution, " all rights of sovereignty of whatsoever kind " in
and over the Hawaiian Islands and their dependencies; although
Hawaii then became " an integral part " of the United States
and subject to its " sovereign dominion; "  although the United
States obtained the absolute fee and ownership of all public,
Government or Crown lands, public buildings or edifices, ports,
harbors, military equipments and all other public property be-
longing to Hawaii; although all its officers took an oath of al-
legiance to the United States ; yet, persons there charged with
infamous crimes could not, as of right, before the passage of
the act of 1900, invoke for their protection, when prosecuted
for crime, the guarantees relating to grand and petit juries
found in the Constitution of the United States—the supremacy
of which instrument was, in effect, declared by the Joint Reso-
lution when existing municipal legislation contrary to its pro-
visions was superseded.

Practically, under the view taken by the court, and so far as
those guarantees were concerned, if Congress had not chosen
to provide a system of criminal procedure—as it did by the act
of 1900—for the government, tribunals and people of Hawaii,

then, for an indefinite time, it may have been for a century, the courts in Hawaii, although acting under and by the authority of the United States, might have tried persons there for capital or infamous crimes in a mode confessedly "contrary to the Constitution of the United States." The Constitution, speaking with commanding authority to all who exercise power under its sanction, declares that "*no* person shall be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury;" and it as clearly forbids a conviction in any criminal prosecution except *upon the unanimous verdict of a petit jury.* In other words, neither the life nor the liberty of any person can be taken, under the authority of the United States, except in the mode thus prescribed. Yet the present holding is that these constitutional requirements need not have been regarded in Hawaii at any time prior to the act of 1900, although that country was an integral part of the United States, and, with its inhabitants, was subject, in all respects, to our sovereign dominion. It follows, under the view of the court, that Congress, by non-action simply, could have kept in force even such municipal legislation of the Hawaiian Islands relating to criminal trials as was in palpable conflict with the Constitution of the United States.

I dissent altogether from any such view. It assumes the possession by Congress of power quite as omnipotent as that possessed by the English Parliament. It assumes that Congress, which came into existence, and exists, only by virtue of the Constitution, can withhold fundamental guarantees of life and liberty from peoples who have come under our complete jurisdiction; who, to use the words of the United States Minister, have become our fellow-countrymen; and over whose country we have acquired the authority to exercise sovereign dominion. In my judgment, neither the life, nor the liberty, nor the property of *any* person, within any territory or country over which the United States is sovereign, can be taken, under the sanction of any civil tribunal, acting under its authority, by any form of procedure inconsistent with the Constitution of the United States. If the accused had committed the crime of murder in the Territory of Arizona; if he had been convicted in any

court in that Territory, except under a presentment or indictment of a grand jury and by the unanimous verdict of a petit jury ; and if he had been then sentenced to be hanged, and was hanged, the judge of the court pronouncing the sentence would have been guilty of judicial murder. Of that the decisions of this court leave no room to doubt; for it has been adjudged repeatedly that the people of the organized Territories, as well as the people of the District of Columbia, are entitled, by force of the Constitution alone, to the guarantees of life, liberty and property found in the Constitution. And yet the result of the present judgment is that the hanging of the accused in Hawaii, an integral part of the United States, after a trial for murder committed there, but not upon indictment of a grand jury or on a verdict concurred in by all of the petit jury, could be sustained as legal if the case had arisen at any time prior to the act of 1900. This result has been achieved by the easy method of declaring that when Congress provided that only the municipal legislation of Hawaii not contrary to the Constitution should remain in force, it did not mean what its express words implied according to their ordinary signification ; that Congress had no reference to the provisions of the Constitution relating to criminal prosecutions, but intended that the modes of criminal procedure in operation in Hawaii should remain in force until Congress otherwise provided, even if they were, as they are admitted to be, contrary to the Constitution—thus conceding to Congress the power of suspending the constitutional guarantees of life and liberty among a people undeniably subject to the authority and jurisdiction of the United States as completely as are the people of our organized Territories.

Three members of the court, constituting the majority who concurred in the *judgment* in *Downes* v. *Bidwell*, 182 U. S. 244, 288, 289, 291, 292, distinctly held that " the Government of the United States was born of the Constitution," and that all the powers enjoyed by it or which it may exercise must be derived either expressly or by implication from that instrument; that that instrument, in respect of every function of the Government, " is everywhere and at all times potential in so far as its provisions are applicable;" that wherever a power is given by the

Constitution and a limitation imposed upon its exercise, "such restriction operates upon and confines every action on the subject within its constitutional limits;" that, "as Congress in governing the territories is subject to the Constitution, it results that all the limitations of the Constitution which are applicable to Congress in exercising this authority necessarily limit its power on this subject;" that "every provision of the Constitution which is applicable to the territories is also controlling therein;" and that "in the case of the territories, as in every other instance, when a provision of the Constitution is invoked, the question which arises is, not whether the Constitution is operative, for that is self-evident, but whether the provision relied on is applicable." In these views the minority in *Downes* v. *Bidwell*, constituting four other members of this court, substantially concurred.

The petit jury system existed in Hawaii long before the passage of the Joint Resolution. But it was inconsistent with the Constitution of the United States, in that it allowed a verdict of guilty in a criminal case by a majority of the jurors. Where was the difficulty in applying in Hawaii the constitutional provision forbidding such a verdict? To have applied that provision to Hawaii would not, in any essential sense, have imposed upon that country a new system for the trial of crimes. It would have only enforced the existing mode of trial so as to conform to the constitutional requirement in respect of petit juries. It would have left untouched the petit jury system in Hawaii, except as it was contrary to the Constitution. Whatever may be said as to the absence of a grand jury system, in Hawaii, it cannot, I think, be said, with any show of reason, that the constitutional provision relating to petit juries was inapplicable in Hawaii after its annexation to this country. Nothing stood in the way of the court instructing the jury in a criminal case, arising after annexation, that unanimity among the jurors as to the verdict was essential under the Constitution.

In my opinion, the Constitution of the United States became the supreme law of Hawaii immediately upon the acquisition by the United States of complete sovereignty over the Hawaiian

Islands, and without any act of Congress formally extending the Constitution to those Islands. It then, at least, became controlling, beyond the power of Congress to prevent. From the moment when the Government of Hawaii accepted the Joint Resolution of 1898, by a formal transfer of its sovereignty to the United States—when the flag of Hawaii was taken down, by authority of Hawaii, and in its place was raised that of the United States—every human being in Hawaii, charged with the commission of crime there, could have rightly insisted that neither his life nor his liberty could be taken, as punishment for crime, by any process, or as the result of any mode of procedure, that was inconsistent with the Constitution of the United States. Can it be that the Constitution is the supreme law in the States of the Union, in the organized Territories of the United States, between the Atlantic and Pacific Oceans, and in the District of Columbia, and yet was not, prior to the act of 1900, the supreme law in territories and among peoples situated as were the territory and people of Hawaii, and over which the United States had acquired all rights of sovereignty of whatsoever kind? A negative answer to this question, and a recognition of the principle that such an answer involves, would place Congress above the Constitution. It would mean that the benefit of the constitutional provisions designed for the protection of life and liberty may be claimed by some of the people subject to the authority and jurisdiction of the United States, but cannot be claimed by others equally subject to its authority and jurisdiction. It would mean that the will of Congress, not the Constitution, is the supreme law of the land only for certain peoples and territories under our jurisdiction. It would mean that the United States may acquire territory by cession, conquest or treaty, and that Congress may exercise sovereign dominion over it, outside of and in violation of the Constitution, and under regulations that could not be applied to the organized Territories of the United States and their inhabitants. It would mean that, under the influence and guidance of commercialism and the supposed necessities of trade, this country had left the old ways of the fathers, as defined by a written Constitution, and entered upon a new way, in follow-

ing which the American people will lose sight of or become
indifferent to principles which had been supposed to be essen-
tial to real liberty.   It would mean that, if the principles now
announced should become firmly established, the time may not
be far distant when, under the exactions of trade and commerce,
and to gratify an ambition to become the dominant political
power in all the earth, the United States will acquire territories
in every direction, which are inhabited by human beings, over
which territories, to be called "dependencies" or "outlying pos-
sessions," we will exercise absolute dominion, and whose inhab-
itants will be regarded as "subjects" or "dependent peoples,"
to be controlled as Congress may see fit, not as the Constitu-
tion requires, nor as the people governed may wish.   Thus will
be engrafted upon our republican institutions, controlled by
the supreme law of a written Constitution, a *colonial* system
entirely foreign to the genius of our Government and abhor-
rent to the principles that underlie and pervade the Constitution.
It will then come about that we will have two governments over
the peoples subject to the jurisdiction of the United States,
one, existing under a written Constitution, creating a govern-
ment with authority to exercise only powers expressly granted
and such as are necessary and appropriate to carry into effect
those so granted; the other, existing outside of the written
Constitution, in virtue of an unwritten law to be declared from
time to time by Congress, which is itself only a creature of that
instrument.

I stand by the doctrine that the Constitution is the supreme
law in every territory, as soon as it comes under the sovereign
dominion of the United States for purposes of civil administra-
tion, and whose inhabitants are under its entire authority and
jurisdiction.   I could not otherwise hold without conceding the
power of Congress, the creature of the Constitution, by mere
non-action, to withhold vital constitutional guarantees from
the inhabitants of a territory governed by the authority, and
only by the authority, of the United States.   Such a doctrine
would admit of the exercise of absolute, arbitrary legislative
power under a written Constitution, full of restrictions upon
Congress, and designed to limit the separate departments of

Government to the exercise of only expressly enumerated powers and such other powers as may be implied therefrom—each department always acting in subordination to that instrument as the supreme law of the land. Indeed, it has been announced by some statesmen that the Constitution should be interpreted to mean not what its words naturally, or usually, or even plainly, import, but what the apparent necessities of the hour, or the apparent majority of the people, at a particular time, demand at the hands of the judiciary. I cannot assent to any such view of the Constitution. Nor can I approve the suggestion that the status of Hawaii and the powers of its local government are to be "measured" by the Resolution of 1898, without reference to the Constitution. It is impossible for me to grasp the thought that that which is admittedly contrary to the supreme law can be sustained as valid.

I have so far considered the case principally in the light of the results that must, as I think, follow from the interpretation placed by the majority on the Joint Resolution of 1898. But in my judgment Congress should not be held to have intended to do what is now attributed to it. When it declared that the municipal legislation of Hawaii *not* "contrary to the Constitution of the United States" should remain in force, it meant that legislation contrary to that instrument should not remain in force after annexation. Those words were inserted out of abundant caution, to make it certain that no municipal legislation of Hawaii contrary to the Constitution should thereafter be regarded as in force. If they were not intended to have that effect, for what purpose were they inserted? What local legislation was declared to be abrogated, if not that which was "contrary to the Constitution?" Under the view taken by the court, those words in the Joint Resolution are made wholly inoperative.

It is said to be evident from the terms of the Joint Resolution that Congress intended it to be merely temporary and provisional. Of course, some further legislation by Congress was contemplated in order to provide a complete territorial government for Hawaii. But in language perfectly direct and explicit, Congress said that *in the meantime* no municipal legis-

lation of Hawaii should be enforced that was "contrary to the Constitution of the United States." And yet a trial conducted in a mode forbidden by that instrument is now sustained as legal.

It is also said that "the *laws* of the United States" were not extended over the Islands until the organic act of April 30, 1900, was passed. But, by the Joint Resolution of 1898 Congress—assuming that action upon its part to that end was necessary—did extend the *Constitution* over the Hawaiian Islands when it declared that the municipal legislation of Hawaii "not contrary to the Constitution of the United States" should remain in force. And yet the court decides that although the trial of Mankichi, if tested by the Constitution, was illegal, it must be sustained from the necessities of the case.

Again, it is said that the words "contrary to the Constitution" in the Joint Resolution referred only to such provisions of that instrument as were *applicable* to Hawaii; and in support of that view, reference is made to that part of the Resolution which keeps alive existing customs regulations between Hawaii and the United States and other countries. It seems to me that the argument based on that clause of the Resolution is misleading and fallacious. Customs regulations are not determined by the Constitution. The authority to make them is given by that instrument to Congress; and it was for Congress to say what should be the nature of the customs regulations to be observed in Hawaii. Its direction that existing Hawaiian regulations of customs duties should remain in force, until otherwise ordered, was, in legal effect, an adoption of them by Congress for the time being. Now, the provisions as to grand and petit juries are in the Constitution, and could not be altered by Congress under any power it possessed. Their applicability, before civil tribunals, in a territory of the United States, was determinable by the Constitution itself. In other words, if the Constitution was in force at all in Hawaii, prior to the act of 1900, it was in force there for all it ordained, in respect, at least, of the guarantees of life and liberty. To sustain the prosecution of Mankichi upon the ground that Congress did not intend to supersede the local law permitting a

verdict in criminal cases by a majority of the petit jury, but did intend to keep such law in force until altered or abrogated by Congress, is, in effect, to say that, if Congress so ordered, persons charged with crime in Hawaii could, consistently with the Constitution, be tried before a single judge. It is not perceived why the 'argument based upon the provision as to customs regulations does not lead, logically, to such a result, nor how that provision can have any bearing upon the present case, unless it be that the power of Congress over criminal proceedings in Hawaii, involving the life and liberty of a freeman, is as full, comprehensive and complete as it is over mere customs regulations. I cannot go that far in upholding the power of Congress over, what some are pleased to call, our "dependencies" or "outlying possessions," and the "subjects" therein residing.

It is again said that the annexation of Hawaii and the transfer of its sovereignty, of whatsoever kind, to the United States did not so *incorporate* it into the United States as to make the Constitution supreme, in *all* respects, in that newly acquired territory. As the two countries desired that Hawaii, upon annexation, should become "an integral part" of the United States; as all the civil, military and judicial officers of Hawaii were required to take and did take an oath of allegiance to the United States; as Hawaii passed under the "sovereign dominion" of the United States and became subject to all valid laws, civil and criminal, that Congress might enact; as its people may be subjected to punishment for any crime or offence, committed against the United States; as by the authority of Hawaii the Hawaiian flag has come down, and in its place that of the United States substituted ; and as Hawaiians cannot rightfully invoke for their protection the authority of any government except that of the United States—in view of these relations between the two countries, it is, to my mind, inconceivable that Hawaii was not so far incorporated into the United States that the Constitution was in force there, after the passage of the Joint Resolution of 1898, in respect, at least, of those personal rights which that instrument expressly guarded against in-

fringement by any tribunal deriving authority from its provisions.

It is further said that under the Joint Resolution of 1898 any *new* legislation must conform to the Constitution of the United States. This must mean that after the passage of that Resolution the Constitution was operative in Hawaii to prevent new legislation inconsistent with its provisions, but was not operative there so as to prevent the enforcement of local enactments or regulations that were confessedly in violation of that instrument. I cannot forbear saying that this view of the Constitution is most extraordinary. It does not commend itself to my judgment. I had supposed that when the Constitution came into operation in any country or over any people, all local laws, customs, or usages, within the same jurisdiction, that were inconsistent with its provisions, necessarily ceased to have any legal force whatever; otherwise, the declaration of the Constitution, that it was the supreme law of the land, would be meaningless.

But it is said that while *most, if not all,* the privileges and immunities contained in the Bill of Rights of the Constitution were intended to apply "*from the moment of annexation,*" yet the two rights created by the constitutional provisions as to grand and petit jurors "are not fundamental in their nature, but concern merely a method of procedure."

It is a new doctrine, I take leave to say, in our constitutional jurisprudence, that the framers of the Constitution of the United States did not regard those provisions, and the rights secured by them, as fundamental in their nature. It is an indisputable fact in the history of the Constitution that that instrument would not have been accepted by the required number of States, but for the promise of the friends of that instrument, at the time, that immediately upon the adoption of the Constitution, amendments would be proposed and made that should prevent the infringement, by any *Federal* tribunal or agency, of the rights then commonly regarded as embraced in Anglo-Saxon liberty; among which rights, according to universal belief at that time, were those secured by the provisions relating to grand and petit juries. Whatever may be the power of the

States in respect of grand and petit juries, it is firmly settled that the Constitution absolutely forbids the trial and conviction, in a *Federal* civil tribunal, of any one charged with crime, otherwise than upon the presentment or indictment of a grand jury, and the unanimous verdict of a petit jury, composed, as at common law, of twelve jurors.

In *Ex parte Milligan*, 4 Wall. 2, 120, 121, the accused, not in the army of the United States, was tried by a Federal military court-martial for a crime against the United States, alleged to have been committed in a State that adhered to the Union; and he was denied the right to a trial by jury. This court, referring to the provisions of the Federal Constitution relating to criminal offences and proceedings, said : " These securities for personal liberty thus embodied, were such as wisdom and experience had demonstrated to be necessary for the protection of those accused of crime. . . . Time has proven the discernment of our ancestors; for even these provisions, expressed in such plain English words, that it would seem the ingenuity of man could not evade them, are now, after the lapse of more than seventy years, sought to be avoided. Those great and good men foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government."

In *Ex parte Bain*, 121 U. S. 1, 12, 13, the court, referring to the constitutional provision relating to grand juries, said : " It is never to be forgotten that, in the construction of the language of the Constitution here relied on, as indeed in all other instances

where construction becomes necessary, we are to place ourselves as nearly as possible in the condition of the men who framed that instrument. Undoubtedly the framers of this article had for a long time been absorbed in considering the arbitrary encroachments of the Crown on the liberty of the subject, and were imbued with the common law estimate of the value of the grand jury·as part of its system of criminal jurisprudence. They, therefore, must be understood to have used the language which they did . . . in the full sense of its necessity and of its value. We are of the opinion that an indictment found by a grand jury was *indispensable to the power of the court* to try the petitioner for the crime with which he was charged."

In *Thompson* v. *Utah,* 170 U. S. 343, 349, 350, 351, which was a case arising in an organized Territory, the question was whether the jury referred to in the original Constitution of the United States, and in the Sixth Amendment, was a jury constituted as it was at common law of twelve persons, neither more nor less. This court said : " When Magna Charta declared that no freeman should be deprived of life, etc., ' but by the judgment of his peers or by the law of the land,' it referred to a trial by twelve jurors. . . . When Thompson committed the offence of grand larceny in the Territory of Utah—which was *under the complete jurisdiction of the United States for all purposes of government and legislation*—the supreme law of the land required that he should be tried by a jury composed of not less than twelve persons. . . . When Thompson's crime was committed, it was his constitutional right to demand that his liberty should not be taken from him except·by the joint action of the court and the unanimous verdict of a jury of twelve persons."

Nevertheless, it is contended that the constitutional provisions in question are not fundamental in their nature ; that whether a person, charged, for instance, with murder, shall be convicted and hung, pursuant to a verdict rendered by a majority of the petit jury, rather than by all the jurors, is only " a method of procedure." My judgment refuses assent to this doctrine. I believe it to be most mischievous in every aspect. The provisions as to grand and petit juries are in the Constitution, and

the mandatory character of that instrument ought not to be disregarded. What tribunal, deriving its authority from the United States, can rightfully hold them to be immaterial? Whether those provisions are fundamental in their nature or not, no Federal civil tribunal, existing under the Constitution, and under a solemn obligation to maintain and defend it, can properly or safely ignore them. If the local law, under which Mankichi was tried and convicted, was contrary to any provision of the Constitution, that instrument should have been respected, whatever the nature of such provision.

The opinion of the court contains observations to the effect that some persons, heretofore convicted of crime in the Hawaiian courts, will escape punishment if the Joint Resolution of 1898 is so interpreted as to make Congress mean what, it is conceded, the words " contrary to the Constitution of the United States " naturally import. In the eye of the law, that is of no consequence. The cases cited by the court fall far short of sustaining the proposition that the court may reject the plain, obvious meaning of the words of a statute in order to remedy what it deems an omission by Congress. The consequences of a particular construction may be taken into account only when the words to be construed are ambiguous. If, after the passage of the Joint Resolution, the local authorities proceeded in the prosecution of crimes under municipal laws palpably contrary to the Constitution, the fault was theirs. They were informed by the Joint Resolution of 1898, by the Secretary of State, as well as by the Proclamation of President McKinley announcing the annexation of Hawaii to the United States, that only local legislation not contrary to the Constitution should remain in force. Their fault cannot justify the court in disregarding the express command of Congress that only municipal legislation that was consistent with the Constitution should remain in force in Hawaii. If the accused is held in palpable violation of that instrument, we cannot shrink from discharging him because of its effect upon convictions in other cases. We must interpret the law as it is written. As just stated, the doctrine is well settled that when the meaning of a statute is plain, there is no room for interpretation. The

consequences are for the lawmaking power. If the intention
of the legislature "is expressed in a manner devoid of contra-
diction and ambiguity, there is no room for interpretation. or
construction, and the judiciary are not at liberty, on considera-
tions of policy or hardship, to depart from the words of the
statute; they have no right to make exceptions, or insert quali-
fications, however abstract justice or the justice of the partic-
ular case may seem to require it." Sedgwick on Constr. of
Stat. & Const. Law, 253, 328. "We are bound to take the act
of Parliament as they have made it; a *casus omissus* can in no
case be supplied by a court of law, for that would be to make
laws." *Jones* v. *Smart,* 1 T. R. 44, 52. "Arguments drawn
from impolicy or inconvenience ought here to be of no weight.
The only sound principle is to declare, *ita lex scripta est,* to
follow, and to obey. Nor, if a principle so just and conclusive
could be overlooked, could there well be found a more unsafe
guide in practice, than mere policy and convenience." Story
on Const. vol. 1, sec. 426. "I shall always deem it a duty to
conform to the expressions of the legislature, to the letter of the
statute, when free from ambiguity and doubt; without indulg-
ing a speculation, either upon the impolicy or the hardship of
the law." Mr. Justice Chase in *Priestman* v. *United States,*
4 Dall. 30, note. When therefore Congress, in words perfectly
clear and free from doubt, declared that the municipal legisla-
tion of Hawaii, not contrary to the Constitution, should remain
in force, does not the court usurp the function of making laws
when it rules that certain municipal legislation of Hawaii was
in force, although it was manifestly contrary to the Constitu-
tion? Can it depart from the plain, distinct words of the stat-
ute upon any ground of policy or to remedy an omission by
Congress?

I am of opinion: 1. That when the annexation of Hawaii
was completed, the Constitution—without any declaration to
that effect by Congress, and without any power of Congress
to prevent it—became the supreme law for that country, and,
therefore, it forbade the trial and conviction of the accused
for murder otherwise than upon a presentment or indictment
of a grand jury, and by the unanimous verdict of a petit jury.

2. That if the legality of such trial and conviction is to be tested alone by the Joint Resolution of 1898, then the law is for the accused, because Congress, by that Resolution, abrogated or forbade the enforcement of any municipal law of Hawaii so far as it authorized a trial for an infamous crime otherwise than in the mode prescribed by the Constitution of the United States; and that any other construction of the Resolution is forbidden by its clear, unambiguous words, and is to make, not to interpret, the law.

The judgment of the District Court of the United States for Hawaii discharging the accused should be affirmed.