In re Naturalization Proceedings of

**WILLIAM ALLEN**

No. 30

District Court of the Virgin Islands

Christiansted Sub-Judicial District
St. Croix

September 6, 1929*

*As taken from Transcript of Record in the United States Court of Appeals, Third Circuit, in the case of Allen (Joyce Ida Allen) v. United States. See Page 598, this column.

J. C. Fox, *Special Naturalization Examiner*

D. H. Jackson, *Amicus curiae*

WILLIAMS, *Judge*

The petitioner, William Allen, seeks naturalization under the provisions of the Act of February 25th, 1927 (infra). He alleges that he was born at Estate Christiana, Jamaica, B.W.I., on the 25th day of August, 1865, and that he emigrated to the United States, from Basseterre, St. Kitts, British West Indies, on or about the 31st day of May, 1920, and arrived at the port of Frederiksted, this island, on the 1st day of June, 1920, on the steamship Guiana. He alleges that he is a clergyman and it is shown that he resided, with his family, in these islands since his arrival. He alleges him-

self to be a British subject. These are the admitted facts in the case.

The Act (Feb. 25, 1927, ch. 192, 44 Stat. 1234; 8 U.S.C. former §§ 5b, 5c, 358a, 377a, 601 note, 731 note; 48 U.S.C. § 1395) * reads, in its entirety, as follows:

"An Act to confer United States citizenship upon certain inhabitants of the Virgin Islands and to extend the naturalization laws thereto.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the following persons and their children born subsequent to January 17, 1917, are hereby declared to be citizens of the United States:

"(a) All former Danish citizens who, on January 17th, 1917, resided in the Virgin Islands of the United States and are now residing in those islands or in the United States or Porto Rico, and who did not make the declaration required to preserve their Danish citizenship by article 6 of the treaty entered into on August 4, 1916 (prec. 1 V.I.C.), between the United States and Denmark, or who, having made such a declaration, have heretofore renounced or may hereafter renounce it by a declaration before a court of record;

"(b) All natives of the Virgin Islands of the United States who, on January 17, 1917, resided in those islands, and are now residing in those islands or in the United States or Porto Rico, and who are not citizens or subjects of any foreign country; and

"(c) All natives of the Virgin Islands of the United States who, on January 17, 1917, resided in the United States, and are now residing in the Virgin Islands of the United States, and who are not citizens or subjects of any foreign country.

"Sec. 2. The following persons, if not ineligible to citizenship, may, upon petition filed within one year after the effective date of this Act, and upon full and complete compliance with all other provisions of the naturalization law, be naturalized without making a declaration of intention:

"(a) All natives of the Virgin Islands of the United States who, on January 17, 1917, resided in the United States, and are now residing in the United States or Porto Rico, and who are not citizens or subjects of any foreign country; and

*For later provisions on the subject of sections 1-4 of this Act, see 8 U.S.C. §§ 1406, 1421.

"(b) All natives of the Virgin Islands of the United States who, on January 17, 1917, resided in the United States, and are now residing in the United States or Porto Rico, and who are not citizens or subjects of any foreign country; and

"(c) Except as otherwise provided in this section or in section 1, all persons, who on January 17, 1917, resided in the Virgin Islands of the United States, and are now residing in those islands, and who are not citizens of the United States.

"Sec. 3. All persons born in the Virgin Islands of the United States on or after January 17, 1917 (whether before or after the effective date of this Act), and subject to the jurisdiction of the United States, are hereby declared to be citizens of the United States.

"Sec. 4. The District Court of the Virgin Islands of the United States shall have jurisdiction for naturalization purposes (including jurisdiction for the purpose of setting aside and cancelling certificates of citizenship under section 15 of the Act entitled 'An Act to establish a Bureau of Immigration and Naturalization, and to provide for a uniform rule for the naturalization of aliens throughout the United States,' approved June 29, 1906, as amended [8 U.S.C. former § 405; see 8 U.S.C. § 1451]); and for the purpose of the naturalization laws residence in the Virgin Islands of the United States shall be considered as residence in the United States.

"Sec. 5. Section 4 of the Act entitled 'An Act to provide a temporary government for the West Indian Islands acquired by the United States from Denmark by the convention entered into between said countries on the 4th day of August 1916, and ratified by the Senate of the United States on the 7th day of September, 1916, and for other purposes,' approved March 3, 1917 [48 U.S.C. § 1395], is amended by striking out the figure '8' and inserting in lieu thereof the figure '6'."

The simple reading of that Act, merely will show that he has no claim under either section 1, section 2, or section 3 thereof, nor does he make any such claim. Subsection (a) of section 1 deals with former Danish citizens and certain Danish citizens who have made, or who may make, renunciation. Subsection (b) deals with certain natives of the

Virgin Islands, as does subsection (c). That section, amongst other things, provides that those persons may renounce before a court of record, that is to say, before any court of record, and does not confine them to the District Court of the Virgin Islands. Subsections (a) and (b) of section 2 deal with certain natives, and subsection (c) deals with certain persons residing in these islands. This section says nothing about any court. Section 3 makes citizens of persons born in the islands after January 17, 1917. This section says nothing about courts, as their rights are entirely covered by the section itself. Therefore, by process of elimination, the petitioner must find his rights in section 4, or they do not exist.

It may be here remarked that the Special Examiner interposed an objection to proceeding with the case on the ground that no certificate of arrival accompanied the petition, although a paper has been filed with the petition dealing with arrival, which paper reads as follows:

"Police and Prison Department,
St. Croix, V.I.U.S.A.
(Office of the Director of Police)
Frederiksted, 21st May, 1929.

"TO WHOM IT MAY CONCERN:

"This is to certify that the REV. WILLIAM ALLEN has been a resident of St. Croix, Virgin Islands of the United States, for a period of over eight years.

"That he arrived in St. Croix, to the best of our knowledge and belief, on, or about, the 1st day of June, 1920, by the steamship 'Guiana', from St. Kitts, B.W.I.

"That at that time there were no official immigration, or emigration, records kept, and that same were not begun until June 1, 1923.

(Signed) F. Coulter,
Immigration Agent, St. Croix, V. I.

(Signed) James Ross,
Immigration Inspector, Port of
Frederiksted, St. Croix, V.I."

I shall take up the two points in the order given, first, as to the general jurisdiction of this court for naturalization purposes, in virtue of said Act of Congress, and, secondly, ought the proceedings to be void on account of no proper certificate of arrival having been filed with the petition?

 In a case of special jurisdiction, we are met, at the very threshold of the inquiry, with the challenge, Has the Court jurisdiction? Does the present case come within the broadest outlines or the deepest penetralia of this section? Now, jurisdiction is the authority under the law to hear a case and render judgment or decree therein. Grignon v. Astor, 2 How. 319, 11 L. Ed. 283. Courts created by statute, or in cases of special statutory jurisdiction, must look to the statute as a warrant of their authority and cannot go beyond it. Cary v. Curtis, 3 How. 336, 11 L. Ed. 576. A court is constrained by the meaning of the words of the statute which mark the extent of its power. United States v. Lombardo, 241 U.S. 73, 36 S. Ct. 508, 60 L. Ed. 897. It is the duty of every court, of its own motion, to enquire into the subject matter of the suit, to determine whether or not it has jurisdiction, regardless of the wishes of the parties, and to be circumspect in seeing that it arrogates to itself no powers, but only exercises those conferred by law. Minnesota v. Hitchcock, 185 U.S. 373, 22 S. Ct. 650, 46 L. Ed. 954. A court cannot proceed at all in a case over which it has no jurisdiction, but must so state and dismiss the case. Ex parte McCardle, 7 Wall. 506, 19 L. Ed. 264. And, in the same case, it was declared, by Chief Justice Chase, that "judicial duty is not less fitly performed by declining

ungranted jurisdiction than in exercising firmly that which the Constitution and the law confer."

■ ■ Furthermore, it has been also declared that consent of the parties cannot confer jurisdiction where the facts do not do it. Ex parte Schollenberger, 96 U.S. 369, 24 L. Ed. 853. And in Penn. Railroad v. St. Louis Railroad Co., 118 U.S. 290, 6 S. Ct. 1094, 30 L. Ed. 83, it was further declared that "it was not competent to any of the parties to confer jurisdiction on the circuit court by waiver of objection to it; the question is one which lies at the threshold of any further proceeding, and must be decided." And in Hip v. Babin, 19 How. 271, 15 L. Ed. 633, it was further held that no admission of the parties can change the law or give jurisdiction to the court in a case over which it had no jurisdiction. In a very recent case, Bryant v. Zimmerman, 278 U.S. 63, 49 S. Ct. 61, 73 L. Ed. 184, that court remarked, that "Both parties treat the case as rightly here and as presenting the question whether the state statute is repugnant to the provisions before quoted from the 14th Amendment, but, as consent or acquiescence of the parties does not suffice to establish our appellate jurisdiction, and some of our number have doubted the existence of such jurisdiction, in this case, we now take up the question." In re Woerner, 31 F.2d 283.

Therefore, from the above authorities, it is clear that it is the court's duty, sua sponte, if the question is not raised by the parties, to enquire into the matter of jurisdiction. It is as much its duty as the determination of the cause on its merits, if jurisdiction is found to exist in it. Therefore, I shall proceed to do so.

By reason of the process of elimination as above made, there can be no doubt that any jurisdiction over a case of this kind must be found within the words of, or inferences to be drawn from said section 4 (Act Feb. 25,

221

1927, supra), which may be said to be in three parts. The first part says that the District Court of the Virgin Islands shall have "jurisdiction for naturalization purposes," and the second, that it shall have jurisdiction for the purpose of setting aside and cancelling certificates of citizenship under section 15 of the act entitled "An Act to establish a Bureau of Immigration and Naturalization, and so forth [June 29, 1906, supra];" and, the third says, that for purpose of the naturalization laws, residence in the Virgin Islands shall be considered as residence in the United States. The first part, it is obvious, tells us in what court such naturalization proceedings as may be instituted in these islands shall be brought. The second part likewise tells us in what court proceedings may be instituted to vitiate certain certificates of citizenship. The real crux of the inquiry is found in the words "shall have jurisdiction for naturalization purposes," while, of course, the whole Act may be examined in aid of their construction.

Now, at least two elements are involved in creating and/or enforcing a right effectively: (1) the act of creation of the right or recognition of an existing one, and (2) the establishment of a tribunal through which the right may be enforced, or the conferring of jurisdiction on an already existent one. Congress might have created a special court through which to enforce this Act, or declare that any court of record shall have jurisdiction, as under section 1, or, as it did, confer jurisdiction on the District Court. I wish to reiterate and emphasize the fact that the proceedings under section 1 may be taken before any court of record, while the place of the proceedings to be taken under section 2 is not provided for therein, and, therefore, the place (court) had to be provided for elsewhere, which was done, in section 4. That, in my opinion, is all that was done, or meant

to be done, by the use of the words "naturalization purposes," and of which I cannot see there can be any serious doubt. Now, said section 4, after declaring that the District Court shall have jurisdiction for "naturalization purposes," concludes the Act by declaring that for naturalization purposes residence here shall be considered as residence in the United States. This is the sum and substance of this section. It makes certain definite statements, leaving no room it seems to me, for any implications. It is not, and it does not profess to be, a complete and comprehensive extension of the naturalization law here. It appears to be anything else but that, if language is to be looked to and given its natural and ordinary effect. And "when a statute limits a thing to be done in a particular mode," said the Supreme Court in the case of Worsted Mill v. United States, 73 L. Ed. 125*, as epitomized in the syllabus, "it includes a negation of every other mode." In Marbury v. Madison, 1 Cranch 173, 2 L. Ed. 72, Chief Justice Marshall said: "Affirmative words are often, in their operation, negative of other objects than those affirmed; and in this case, a negative or exclusive sense must be given to them or they have no operation at all." When this statute granted certain rights relative to citizenship it negatived the idea of any others being granted. However, it is contended that such is, nevertheless, the case, reliance being placed on the words "naturalization purposes" and the last clause of the said section 4 for their authority. If such a meaning cannot be wrung from section 4, it is admitted, on all hands, that it does not exist. A superficial view might give the impression — though I do not see how — that all aliens were to have the benefit of the Act, and, certainly, a proper examination of it will show otherwise. The first three sections show what naturalization is to

*So in original.

take place in this jurisdiction. It deals with the substantive part of the law, in so far as subject matter is concerned, with the exception of the last part of section 4, which declares that these islands shall be considered part of the United States for naturalization purposes. What are the naturalization purposes referred to by the Act? Is it not obvious that such naturalization purposes as are to be found in the parts of the Act, inclusive of the first and second parts of section 4 (as that section has been heretofore divided), which merely provided for the court through which the purposes already declared shall be effective? Congress was very careful in singling out the classes of persons upon whom it desired to confer the privilege of naturalization, it seems to me. If Congress had intended to extend the naturalization laws generally, to this jurisdiction, it could have done so in very simple words, and doubtless would have done so. If the general naturalization laws of the United States are extended by this Act the extension can only be by implication. There are no words directly conferring this right. The first part of section 4 merely deals with the matter of jurisdiction and not with substantive rights. If Congress intended to so extend the general naturalization laws, I think I can say, and say it without flippancy, with the court in sexton v. Daly, et al., 95 Cal. App. 754, 273 Pac. 109, a case wherein it was contended that community property rights had been disposed of in the instrument in question, that "singularly inappropriate language was employed to accomplish its (her) purpose." I do not ascribe to Congress any such ineptitude of expression or circumlocution in this case. I am perfectly satisfied that if it had been intended that the general naturalization laws of America were to be extended here, they would have been extended in unequivocal terms. If the whole naturalization law had been extended why specifically mention and extend section 15 thereof (of Act June

224

29, 1906, supra), which is in the very body of the general naturalization law? Would any legislative body that had extended the naturalization law here expressly mention some particular section in the middle thereof? Does not this very express and specific Act exclude the idea that the general law has been extended here? This seems to me to be an additional evidence of the intention of Congress, which intention was to favor only those persons mentioned in the first three sections of the Act of February 25th, 1927 (supra).

Several acts of Congress have been heretofore extended to these islands, and that extension has been made without the slightest ambiguity, but, on the contrary, with the utmost clarity and explicitness. The language (of Act Nov. 23, 1921, ch. 134, § 3, 42 Stat. 223; 27 U.S.C. former § 2) extending the National Prohibition Act (27 U.S.C. former § 1 et seq.) here is as follows: "Section 3. That this act and the National Prohibition Act shall apply not only to the United States but to all territory subject to its jurisdiction, including the territory of Hawaii and the Virgin Islands, and jurisdiction is conferred on the courts of the territory of Hawaii and the Virgin Islands to enforce this act and the National Prohibition Act in such territory and islands."

What I have been above endeavoring to make clear is made perfectly clear by this language. The first clause, or part of that section, extends the prohibition law to these islands. The second clause, or part thereof, confers jurisdiction on the courts of the islands. Thus it is recognized by Congress that in making an act of Congress effective in these islands two things are ordinarily necessary, first, the extension of the law, and, secondly, the creating or conferring of jurisdiction on some court. Two distinct acts are required, or apparently ought to be required. Of course, if there is something in the law that says that all laws, whether acts of Congress or ordinances of the local legis-

lative bodies shall be enforced through certain courts then it would not be essential in each individual matter to expressly mention jurisdiction, but, however, if Congress wanted a particular court to have jurisdiction it would have to say so, even in this hypothesis.

The Income Tax Law was extended by a rider to the Naval Appropriation Act (see 48 U.S.C. § 1397), as follows: "Provided, further, that the income tax laws now in force in the United States of America, and those which may hereafter be enacted, shall be held to be likewise in force in the Virgin Islands of the United States, except that the proceeds of such taxes shall be paid into the treasury of said islands."

In this Act it was assumed that the courts here would have jurisdiction of any act extended here by Congress, with which assumption I cannot, at this time, say I am in disagreement. At any rate, in neither case has Congress been ambiguous in its actions. It said exactly what it meant. In one case it definitely declared the courts here should have jurisdiction, and in the other case it clearly assumed that the courts would have jurisdiction. In any circumstance there was no ambiguity of language. The assumption may have been wrong in the latter case, and, assuming that it is wrong, for the sake of the point, there is certainly no ambiguity in any expression found in that proviso. For these reasons I am entirely satisfied that Congress merely meant to confer jurisdiction on the District Court to carry out the naturalization purposes expressed in the second section of the said Act of February 25, 1927, and no other. The last part of section 4 has been mentioned as possibly having some bearing on this point, but that clause is perfectly consistent with the balance of the Act as just construed. It is entirely possible, and not improbable, that Congress meant to give those persons who go to the States, and, desiring naturalization, the benefit of resi-

dence here. The fact of their going to the States, and the time that would have to be spent there before naturalization, would qualify them in a general sense, for citizenship. It is entirely possible that Congress might not have considered these outlying islands, aliens in many respects, or some respects at least, as being a school for naturalization, while at the same time recognizing certain obligations, albeit only moral in their nature, to confer citizenship on certain persons and to provide for the naturalization of certain other persons.

█ █ It has been said that construction lies entirely within the domain of ambiguity. Chief Justice Marshall, in U.S. v. Wiltberger, 5 Wheat. 76, 5 L. Ed. 37, inter alia, said: "Where there is no ambiguity in the words there is no room for construction. The case must be a strong one indeed which would justify the court in departing from the plain meaning of the words . . . ". And that court, in Hamilton v. Rathbone, 175 U.S. 414 (419), 20 S. Ct. 155, 44 L. Ed. 219 (221), said: "Indeed the cases are numerous in this court to the effect that the province of construction lies wholly within the domain of ambiguity that an extended review of them is unnecessary. The whole doctrine applicable to the subject may be summed up in a single observation, that prior acts should be resorted to to solve but not to create the ambiguity."

█ Were it not for the existence of the Naturalization Law there would be no suggesting of ambiguity in this statute whatsoever. It would be perfectly plain that only the classes of persons mentioned in the first three sections would be entitled to naturalization, as there would be no machinery provided for any other persons or classes. Of course, if the statute is of doubtful meaning "The general rule is perfectly well settled that," as the Court, in Hamilton v. Rathbone, supra, said: "Where a statute is of doubtful meaning and susceptible upon its face of two constructions the

227

court may look into prior and contemporaneous acts, the reasons which induced the act in question, the mischiefs intended to be remedied, the extraneous circumstances, and the purpose intended to be accomplished by it, to determine its proper construction. But where the act is clear upon its face, and when standing alone it is fairly susceptible of but one construction, that construction must be given it." A very recent case, U.S. v. Mo. Pac. R.R. Co., 278 U.S. 269, 49 S. Ct. 133, 73 L. Ed. 322, further eliciting this rule, goes on to say: "Where doubts exist and construction is permissible, reports of the committees of Congress and statements by those in charge of the measure and other like extraneous matter may be taken into consideration to aid in the ascertainment of the true legislative intent. But, where the language of an enactment is clear and construction according to its terms does not lend to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed. United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 325, 17 S. Ct. 504, 41 L. Ed. 1007; Pennsylvania R.R. Co. v. Coal and Min. Co., 230 U.S. 184, 199, 33 S. Ct. 893, 57 L. Ed. 1446, 1452, Am. Cas. 1911A, 315; Mackenzie v. Hare, 239 U.S. 299, 308, 36 S. Ct. 106, 60 L. Ed. 297, Ann. Cas. 1916E, 645; Caminetti v. United States, 242 U.S. 470, 37 S. Ct. 192, 61 L. Ed. 442, L.R.A. 1917F, 502, Ann. Cas. 1917B, 1168.

"But the reasons for and the significant circumstances leading up to the enactment may be noticed in confirmation of the meaning conveyed by the words used. Johnson v. Southern P. Co., 196 U.S. 1, 19, 21, 25 S. Ct. 158, 49 L. Ed. 363, 370, 371, 17 Am. Neg. Rep. 412; Oceanic Steam Nav. Co. v. Stranahan, 214 U.S. 320, 333,

29 S. Ct. 671, 53 L. Ed. 1013, 1019, Northern Pac. Ry. Co. v. Washington, 222 U.S. 370, 380, 32 S. Ct. 160, 56 L. Ed. 237, 240; McLean v. United States, 226 U.S. 374, 381, 33 S. Ct. 122, 57 L. Ed. 260, 263."

There are cases which do not apply to naturalization laws exactly the same rule of construction. They say that they should be rather strictly construed or constructed in favor of the United States and against the applicant. In re Kempson, 14 F.2d 668. However, if we pursue the more liberal rule, I think the conclusions that I have reached will be fully sustained. How, assuming, for the moment, that there is some merit in the contention that there is ambiguity in the said Act, where would an examination into the history of the case lead us?

Briefly the history of the situation here involved is as follows:

The United States purchased, from Denmark, what was known as the Danish West Indies, and now known as the Virgin Islands, the treaty of cession becoming effective on January 17, 1917. By that treaty Danish citizens or subjects who wished to retain Danish citizenship were allowed to do so and those who wished to accept citizenship in the United States likewise were allowed to do so. See Article 6 of the Treaty. The State Department held that those persons who renounced Danish citizenship became American nationals, thereby adopting the holding of the Supreme Court of the United States as to Puerto Rico, as found in the Insular Cases (182 U.S. 1 et seq., 21 S. Ct. 743 et seq., 45 L. Ed. 1041 et seq.). As no judicial decision has been rendered on the subject, the holding of the State Department has been accepted as the proper construction of said Article 6, hence those persons who had been declared only nationals eventually desired to become citizens and became restive, as well as certain other persons who have felt that by long residence here they acquire certain moral rights. It

was in recognition of this alleged moral obligation that the Act of February 25th (1927, supra). That this is the case may be seen from a reference to the Committee's Report which reads in part: "This bill confers United States citizenship upon certain inhabitants of the Virgin Islands and also extends opportunity for naturalization to certain other former inhabitants of the Virgin Islands. It will be recalled that the Virgin Islands were acquired by purchase under a treaty with Denmark in January, 1917. At the time it was understood by all that when the United States purchased these islands the citizenship of the inhabitants thereof was transferred to the United States.

"The Navy Department, who have been administering the islands ever since 1917, have always contended that this was the case. The State Department, however, have put a different interpretation upon the treaty, with the result that ever since 1917 the inhabitants of the Virgin Islands, formerly citizens of Denmark, have been people 'without a country'. Whatever the correct interpretation of the treaty may be, it has been admitted by all that there is a moral obligation on the part of the United States to confer United States citizenship on these inhabitants of the Virgin Islands formerly citizens and subject of Denmark."

This language, Mr. Kiess, Chairman of the Insular Affairs Committee of the House, repeated at the time it was up in the House for discussion. It is obvious that the persons about whom the Committee and Congress showed a solicitude are those persons who were "formerly citizens of Denmark," and who have been, since the transfer, people 'without a country' ", but, certain other classes of persons, as the Act shows, were given the benefit of the "moral obligation," too, namely, those of long residence here. It is obvious that his remark — "people without a country" — was rhetorical rather than factual, as the former citizens

of Denmark were American nationals and had a country as much as anybody, except as to technical "citizenship." The State Department has held that those persons, former Danish citizens, were and are citizens of the Virgin Islands entitled to the protection of the United States. The Committee's Report further remarks — which I have said heretofore was repeated by the Chairman in the House — that "it was understood by all that when the United States purchased these islands the citizenship of the inhabitants thereof was transferred to the United States." It is obvious that the "inhabitants" that he refers to are those inhabitants who were Danish citizens. It would certainly seem that there could be no question about the inhabitants he refers to in his report being those to whom there was a "moral obligation of the part of the United States." Certainly there was no moral obligation to citizens or subjects of Great Britain or any other country, except by a great stretch in the meaning of that phrase. However, Congress, in order to be on the right side of what is termed a moral obligation, did extend citizenship, or the right to acquire citizenship, to certain people who had been of long residence in these islands. A reading of the Report will show that the burden of the argument was the moral obligation — that the Act was predicated upon the existence, in fact, of that moral obligation.

I may say, en passant, that I cannot say — but I do not so decide — that I am now in entire agreement with the view taken by the State Department as to the citizenship of former Danes in virtue of said Article 6. But this is a matter that may, and should, be left for a proper case.

██ I wish to emphasize, and keep in the forefront, the fact that the privilege of naturalization of certain classes of persons was not extended on general principles, but was extended because of a moral obligation. The legislation was not passed because it was thought on account of politics

231

or any other reasons that citizenship should be extended to any of the inhabitants of these islands. This accentuates and entirely supports the view that I have above taken — that aliens, in an all inclusive sense of that word, were not in the mind's eye or in contemplation of the Committee or Congress. A contrary view, I repeat, would ascribe to Congress an ineptitude of expression such as I am not willing to ascribe to it, or concur in.

 It is intimated that the Act should be considered a general one, otherwise it would fall afoul of a part of section 8, Article 1, of the United States Constitution (prec. 1 V.I.C.), which confers power upon Congress "to establish a uniform rule of naturalization . . .". It suffices to say, in answer to this, that that part of the Constitution does not extend to those islands, and has not been so extended by Congress. The (U.S.) Circuit Court of Appeals (Third Circuit), in Soto v. United States (1 V.I. 536), 273 Fed. 628 (633) — a case arising in this jurisdiction — held that this was not incorporated territory, and then went on to epitomize the decisions of the Supreme Court of the United States regarding the applicability of the Constitution to such territory, saying: "The only laws of the United States applicable to the Virgin Islands are the act of Congress of March 3, 1917, and the fundamental law of the Constitution guaranteeing certain rights to all within its protection. These rights have, by repeated decisions of the Supreme Court, been divided into two classes — artificial or remedial rights, which are peculiar to our own system of jurisprudence; and natural or personal rights, enforced in the Constitution by prohibition against interference with them. Rights of both kinds are embraced within the Fifth and Sixth Amendments to the Constitution. Remedial rights there guaranteed are, for instance, the right of presentment by grand jury and of trial by jury. It has been decided that rights of this character are not among the fundamental

rights which Congress in legislating for a territory not incorporated into the United States must secure to its inhabitants. Talton v. Mayes, 163 U.S. 376, 16 S. Ct. 986, 41 L. Ed. 196; Hawaii v. Mankichi, 190 U.S. 197, 33 S. Ct. 787, 47 L. Ed. 1016. In harmony with these decisions it has been further held that until Congress shall extend rights of this character to the inhabitants of newly acquired territory, the judicial system prevailing in such territory — not the system contemplated by the constitution — is applicable and controlling. But in the Insular Cases — De Lima v. Bidwell, 182 U.S. 1, 21 S. Ct. 743, 45 L. Ed. 1041; Dooley v. United States [182 U.S. 222, 21 S. Ct. 762, 45 L. Ed. 107; Downs v. Bidwell] 182 U.S. 244, 21 S. Ct. 770, 45 L. Ed. 1088; as well as in Hawaii v. Mankichi, 190 U.S. 197, 23 S. Ct. 787, 47 L. Ed. 1016, and Dorr v. United States, 195 U.S. 138, 24 S. Ct. 808, 49 L. Ed. 128, 1 Ann. Cas. 697 — where the Supreme Court reviewed nearly the whole range of sovereignty of the United States over its possessions, defining what laws, statutory and constitutional, are not applicable to unincorporated territories until Congress shall extend them, it is made very certain there are constitutional rights of a natural or personal nature of which Congress cannot, in legislating for such outlying territories, deprive their inhabitants. In these cases the Supreme Court clearly expressed the opinion, not on the point of the decision, to be sure, but as a logical corollary, that even if the people of such territories — not being possessed of the political rights of citizens — are regarded as aliens, they are entitled in the spirit of the Constitution to be protected in life, liberty and property and not to be deprived thereof without due process of law.

"It was, we think, these natural or personal rights, vouchsafed by the Constitution to everyone within its operation, that Congress had in mind when by the Act of March 3, 1917, it provided for retention in the Virgin Islands of local

procedure 'in so far as compatible with the changed sovereignty . . .' "

The principle enunciated in the Insular Cases, supra, and in the Soto Case, supra, has been recently affirmed and followed in the case of Balzac v. Porto Rico, 258 U.S. 298, 42 S. Ct. 343, 66 L. Ed. 627. Certainly nobody at this late day will contend that the subject of naturalization in any wise involves rights. It is purely an artificial or political right. Terrace v. Thompson, 263 U.S. 197, 44 S. Ct. 15, 68 L. Ed. 255; Petition of Connal, 8 F.2d 374. Hence, it must be held, that the portion of the Constitution regarding naturalization is inapplicable to this jurisdiction. See People v. Charles Bell, No. 10-1927, November 2, 1927 (D.C.V.I., St. Thomas Jurisdiction).

▮ Now, however, assuming for the sake of argument — but denying it otherwise — that that part of the Constitution is in force in these islands, does not that prove too much? It could hardly be argued that the special privilege and rights conferred by the Act in question — of February 25, 1927 — are uniform with the other naturalization laws of the United States. It is obvious that special privileges are granted certain classes of persons, and, therefore, cannot be uniform with the naturalization law of the United States, which is applicable to all alike. By such an argument the proponent is hoisted by his own petard. Certainly no such privileges as those granted and conferred in the first three sections of said Act could be conferred upon people in the State of Maryland to the exclusion of those of the other States of the Union, and if they could not be conferred on people in that State to the exclusion of others, how could such rights be conferred on the people of those islands to the exclusion of other people of the United States, without violating the rule of uniformity?

For these reasons, I can see no possible right of this

court to assume jurisdiction over this case, and, therefore, if it were assumed, there would be a clear case of usurpation of jurisdiction. Hence there is nothing else to do but deny the petition.

Now, the Special Examiner, in due time, moved that the petition be voided because the petitioner did not file with his petition the certificate of arrival. Maney v. U.S., 278 U.S. 17, 49 S. Ct. 15, 73 L. Ed. 756; In the Matter of Petition for Naturalization of Marie Richard, No. 28, September Term, 1928, D.C.V.I., Christiansted Sub-Judicial District.

It is a fact, however, that he did file a paper concerning his arrival, and signed by the Immigration Agents, but not signed by the Commissioner of Immigration, or by any person on his behalf. If it were a paper signed by competent authority, though defective in some particular, I think an amendment would be allowable, but the paper in question was not such a paper, it seems to me. The paper is null, not merely defective, in that there can be no pretense of its being signed by any competent authority; in other words, it does not amount to a certificate of arrival, but is merely a foreign paper attached to the petition. I repeat that if the paper amounted to a certificate, even though defective, I think an amendment should have been allowed. Such not being the case it is not allowed, and even though the Court had jurisdiction to hear and determine the case the motion of the Special Examiner would have to be granted.

In order that there may be no misunderstanding of my views of the case, because I have seen fit to elaborately discuss the same, I wish to say that I do not want it understood therefrom that by so doing I have shown that great labor was required to reach the conclusion just announced; but the prolixity of this opinion — if it is really prolix in view of the several and important points involved — is entirely

due to a desire to leave no possible room for some caviller or perverse-minded person to misconstrue the ruling, and to make my view so plain that "he who runs"; as well as the most myopic minded, "may read it" — and, further, because many may consider the subject very important.

Petition denied.