O’NIELL, Chief Justice.
 

 The State is suing for severance taxes on timber bought by the defendant, on the open market, during the period from May 1, 1930, to September 30, 1937. The amount claimed is $931.26, plus the interest and attorney’s fee. The timber was not bought under any contract requiring the lumber company to pay the price to the party or parties who owned the timber at the time
 
 *749
 
 when it was severed from the land. The timber was bought in comparatively small quantities, at different times, from persons who hauled the timber to the mill and sold it there, without previous negotiations. The attorneys for the State claim that the defendant is liable for the amount of the severance taxes on the quantity of timber so bought, on the ground, that it was the duty of the defendant to deduct the amount from the price paid for the timber, and’ to pay the amount of the tax over to the tax collector, under the provisions of Section. 9 of Act No. 140 of 1922, or to the supervisor of public accounts, under the provisions of the corresponding section of Act No. 24 of the Second Extra Session of 1935. The judge of the district court sustained the defendant’s plea that the 9th section of the statute was not applicable to a purchase of natural resources on the open market, and without a previous contract, but was applicable only to purchases made under contracts or agreements requiring the purchaser to make payment direct to the party or parties who owned the natural resource at the time of its severance from the soil or water. The judge therefore rejected the State’s demand.- The State is appealing from the decision.
 

 The only question is whether the 9th section of the statute is applicable to any and all purchases of natural resources, or only to purchases made under contracts or agreements requiring the purchaser of the natural resource to make payment direct to the owner or owners thereof at the time of its severance from the soil or water. The 9th section is exactly the same in the act of 1935 as it was in the act of 1922, except that, in the second ¡paragraph of this section, in the act of 1922, the taxes were payable to the tax collector, and in the act of 1935 the taxes were made payable to the supervisor of public accounts. Thé act of 1922 was amended several times, but not in a way that could affect the question presented in this case. The act of 1935 is so nearly like the act of 1922, as it was' enacted originally and as amended from time to time, that it is not necessary to analyze or refer to any other statute than the act of 1935. The 9th section of the act reads thus:
 

 “Section 9. Every person, firm, corporation or association of persons purchasing oil, gas or any other natural resources severed from the soil or water, under contracts or agreements requiring such purchaser to make payment direct to the owners of such oil, gas or other natural resource, is hereby authorized, empowered and required to deduct from any amount due any owner of such natural resource the amount of the tax levied by the provisions of this Act before making such payments.
 

 “All persons, firms, corporations or associations of persons required to deduct from amounts due to others the tax herein levied shall file with the Supervisor of Public Accounts, and with the tax collector of the parish where such natural resources are severed from the soil or water, the reports herein required, and shall at the same time pay to the said Supervisor of Public Accounts the amount of the tax thus deducted or withheld under the pro
 
 *751
 
 visions of this Act; provided that n.othing herein shall be construed as releasing the person, firm, corporation or association of persons severing the resources from liability for the payment of said taxes.”
 

 [Then follows a provision for reimbursing the tax collectors for any loss that they might suffer by reason of the change in the method of collecting the tax.]
 

 Our opinion is that the term “owners of such oil, gas or other natural resource,” as the term is used in Section 9 of the statute, means “owners at the time of severance,” as the term is used in the preceding sections, — specifically, in Sections 1, 5. and 6.
 

 Section 1 of the act provides that the tax shall be paid “by the owner or proportionately by the owners thereof at the time of the severance.”
 

 Section 2 fixes the rate of the tax for each of the several kinds of natural resources severed from the soil or water.
 

 Section 3 provides that the supervisor of public accounts shall collect the tax quarterly.
 

 Section 4 provides for an apportionment of the amounts allocated to the parishes from which the resources are produced.
 

 Section 5 declares that every person, firm, etc., severing any natural resources from the soil or water shall file quarterly reports with the supervisor, on forms prescribed by him, showing the quantity of each kind of resources severed or produced during the preceding quarter, and the names of the “owners at the time of severance,” and the portion owned by each of them, etc. In this section the party making the report is required, at the same time, to pay to the supervisor the amount of the tax, according to the rates fixed in Section 2.
 

 Section 6 declares that, except as otherwise provided, the making of the reports and the paying of the taxes shall be by those actually engaged in the operation of severing the natural resources from the soil or water; and this section provides that the reporting taxpayer shall deduct from the value of the products severed the proportionate amount of the tax owed by each of the “owners of such natural resources at the time of severance.” The exception to this requirement, that the tax is to be paid by the party actually engaged in severing the natural resource from the soil or water, is stated in Sections 8 and 9.
 

 Section 7 requires all who are engaged in severing oil, gas or other natural resources from the soil or water, “under contracts or agreements requiring payment direct to the owners” of any royalty interest, excess royalty, or working interest, to deduct from the amount of such royalty interest, excess royalty, or working interest, the amount of the tax, before making such payments.
 

 Section 8 provides that, when the party engaged in severing oil or gas, or other natural resources from the soil or water, “under contracts or agreements requiring payments direct to any owner” of a proportionate share of the natural resources, as set forth in Section 7, shall sell the oil
 
 *753
 
 or gas or other natural resource “under contracts or agreements requiring such purchasers to pay all owners of such natural resources direct,” then the party who actually severed the oil, gas or other natural resource from the soil or water is not required to deduct the tax, but in such cases the deductions shall be made by the- purchaser before making payments to the owners of the oil, gas or other natural resources; provided that nothing in this section shall be construed as releasing from his liability for the payment of the tax the one who severed the products from the soil or water.
 

 Section 9 is merely a corollary or complement of the provisions of Section 8. That section merely provides that, when the producer of the natural resource sells it under a contract or agreement requiring the buyer to make payment “direct to any owner” of such natural resources, — e. g., when an operator under an oil or gas lease sells and delivers the oil or gas to a pipe line company,- — -the seller, of course, is not obliged to deduct the amount of the taxes on the quantity of oil or gas for which payment is to be made to the owner at the time of severance; but in such cases the deductions are to be made by the purchaser of the product under the contract with the producer. Then follows Section 9, which imposes and defines the obligation of the purchaser of the product under such contracts or agreements. The obligation is imposed in exactly the sam'e words in which the obligation is imposed upon the producer in Section 7, viz.: “is hereby authorized, empowered and required to deduct from any amount due any-owner of such natural resource the amount * * * levied by the provisions of this Act before making such payments.”
 

 Although it is not stated, it cannot be doubted, and in fact it is not disputed, that “the owners” referred to in Sections 7 and 8 of the act are “the owners at the time of severance,” as stated in Sections 1, 5 and 6. By the same token “the owners” referred to in Section 9 are “the owners at the time of severance.”
 

 The framers of the severance-tax statutes had in mind the taxing of the producing of oil and gas, more than the taxing of the severing of timber or other natural resources from the soil or water. The ' provisions of the statute, however, aré applicable to the collection of the tax levied on the severing of timber and other natural resources, besides oil and gas. The provisions of Sections 8 and 9, when applied to the production of oil or gas, have reference to sales made by a producer to a pipe line company, or to an oil refinery,— as in the case of State v. Standard Oil Co., 188 La. 978, 178 So. 601. These sections of the act, when applied to the tax levied on the severing of timber from the soil,have reference to sales made under contracts or agreements requiring the purchaser to pay the price to the owner or owners of the standing timber, or the stumpage price, if the severing of the timber is done under a stumpage contract.
 

 The phraseology of Section 9 makes it utterly inapplicable to sales made on the open market, not in pursuance of a previous contract requiring payment to be made to the owner or owners of the product at
 
 *755
 
 the time of its severance from the soil or water. The qualifying phrase, “under contracts or agreements requiring such purchaser to make payment direct to the owners of such oil, gas or other natural resource,” would be a waste of words, if this section of the act is applicable to sales made on the open market. As the trial judge has pointed out in his written opinion, the tax would become a sales tax on natural resources severed from the soil or water, if Section 9 of the statute should be construed to mean that the tax must be deducted from the price of all sales of natural resources. There is no doubt about the correctness of the judge’s comment, in that respect, because the second paragraph of Section 9 declares that whoever is required to deduct the tax from amounts due to others is required also to report the deduction to the tax collector and to the supervisor of public accounts, and at the same time to pay to the supervisor' the amount of the. tax deducted or withheld under the provisions of the statute. In other words, a purchaser of a natural resource cannot be obliged, by the provisions of Section 9 of the statute, to deduct or withhold the amount of the tax from the purchase price, unless he is obliged also to pay the amount of the tax to the supervisor, according to the second paragraph of the 9th section of the statute.
 

 It is argued on behalf of the State that all purchases of natural resources, — even purchases made on the open market, — are within the letter of Section 9 of the severance-tax law. Purchases made on the open market may be within the letter of the law, but they are not within its spirit. They are within the letter of the law in the sense only that every sale is essentially a contract or an agreement, and that every such contract or agreement is one which requires the purchaser to make payment direct to the owner of the thing sold, because the law requires that the seller must be the owner, or there is no valid sale. But that interpretation of Section 9 reads out of it entirely the phrase “under contracts or agreements requiring such purchaser to make payment direct to the owners of such oil, gas or other natural resource.” That phrase would have been omitted, and the remaining phraseology would be perfect, if the Legislature had intended that Section 9 of the statute should have the meaning which is contended for in this case. A meaning that is within the letter of a law is not its true meaning unless it is also within the spirit of the law. As Mr. Justice Brown remarked in his very lengthy discussion of this subject in Hawaii v. Mankichi, 190 U.S. 197, 212, 23 S.Ct. 787, 788, 47 L.Ed. 1016, 1020:
 

 “Without going back to the famous case of the drawing of blood in the streets of Bologna, the books are full of authorities to the effect that the intention of the lawmaking power will prevail, even against the letter of the statute; or, as tersely expressed by Mr. Justice Swayne in Smythe v. Fiske, 23 Wall. 374, 380, 23 L.Ed. 47, 49: ‘A thing may be within the letter of a statute and not within its meaning, and within its meaning, though not within its letter. The intention of the lawmaker is the law.’ ”
 

 
 *757
 
 There is another section of the statute that would serve no purpose, and be without effect, if we should construe Section 9 as being applicable to any and all sales of natural resources. We refer to Section 20, which requires all purchasers of natural resources to report, under oath, to the supervisor of public accounts, every purchase of any natural resource, and to give the name and address of the party from whom the purchase was made, and the kind and quantity purchased, etc. This section of the statute does not require the purchasers of natural resources to deduct or withhold the severance tax from the price, or to.pay the tax, — as Section 9 requires of purchasers coming under the provisions of that section. Therefore, if all purchasers of natural resources were obliged to comply with the provisions of Section 9 of the statute, by deducting the severance tax from the price, and by reporting the purchase and paying the tax to the supervisor, Section 20, which requires all purchases of natural resources to be reported to th'e supervisor by the purchaser, under penalty of a fine, would be unnecessary. If the Legislature had intended that all purchases of natural resources should come within the provisions of Section 9 of the statute, the penalty for a failure to report a purchase to the supervisor would have been imposed in that section of the statute.
 

 It is conceded in a supplemental brief for the State that the purpose of Section 20 of the statute is to enable the supervisor to trace all natural resources back to the time and place of their severance, through whatever hands they have passed, and thus to ascertain who severed the resources, and to make sure that he paid the severance tax. The State has not complained that the defendant in this case was guilty of a failure to report the purchases of timber made during the period from May 1, 1930, to September 30, 1937. One or another of the inspectors or auditors employed by the supervisor called at the defendant’s place of business, from time to time, during that period, and checked the quarterly reports with the log scale and other records. As far as the record in this case goes it does not appear that the severance taxes on the timber bought by the defendant during the period stated were not paid by the parties who severed the timber from the soil.
 

 The attorneys for the State, in a supplemental brief, quote an excerpt from the opinion that was rendered in State v. Standard Oil Co., 188 La. 978, 1007, 178 So. 601, 610, to the effect that the severance-tax law has imposed the duty upon all purchasers of natural resources to pay the severance tax thereon, and that a failure of a purchaser to deduct the amount of the tax from the price paid would not relieve the purchaser of the obligation to pay the tax. The only purchases that were ■ dealt with or referred to by the court in the case cited were purchases made by an oil refining company, of oil delivered into the company’s pipe line, under contracts or agreements requiring payments of the price of the oil to be made direct to the owners of the oil at the time of its severance from the soil. The purchases, therefore, came squarely within the provisions of Sections 8 and 9 of the statute. Hence, in that case,
 
 *759
 
 the court did not express an opinion with regard to oil purchased on the open market. The opinion had reference only to purchases made under a contract or agreement requiring payment of the price to be made direct to the owner or owners of the oil. at the time of its production.
 

 The attorneys for the State, in their supplemental brief, cite three decisions construing statutes of other states, viz.: Standard Oil Co. v. Brodie, 153 Ark. 114, 239 S.W. 753; Wiseman, Commissioner of Internal Revenue et al. v. Phillips, 191 Ark. 63, 84 S.W.2d 91; and Standard Oil Co. v. Fitzgerald, Secretary of State of Michigan, 6 Cir., 86 F.2d 799. In Standard Oil Co. v. Brodie, supra, the constitutionality of a statute of Arkansas .(Acts 1921, p. 685, §§ 1-4), requiring sellers of gasoline, kerosene, or other products to be used in propelling motor vehicl.es, to collect from the purchaser a tax of 1 cent on every gallon sold, was attacked on several grounds. The rules of interpretation which the court applied to the statute are the familiar rules which the judge of the district court applied in the present case. In the case of Wiseman, Commissioner, etc., the statute in contest (Act No. 233 of 1935, p. 591) was a sales-tax statute of Arkansas, named in Section 1 “Arkansas Emergency Retail Sales Tax Law.” The questions that were decided in the case, concerning the validity of the tax, have no application to the present case. In Standard Oil Co. v. Fitzgerald, Secretary of State, the Statute of Michigan (Pub.Acts 1927, No. 150) which was under attack required every,wholesale distributor of gasoline to file monthly statements showing all gasoline received during the preceding month, and to pay a tax of 3 cents per gallon thereon. The only point that was decided was that the statute was unambiguous in that it required the tax to be paid on the amount of gasoline received, not on the amount shipped out, by the distributor.
 

 Our conclusion is that the judgment appealed from in this case is correct.
 

 The judgment is affirmed.
 

 HIGGINS, J., absent.